

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-423-CV**

EMILY FARLOW, INDIVIDUALLY                                APPELLANTS
AND AS NEXT FRIEND OF
ANDREW JOSEPH FARLOW AND
LAUREN CATHERINE FARLOW,
MINORS, AND AS GUARDIAN OF
THE PERSON AND THE ESTATE OF
LEE WILLIAM FARLOW, AND
LEE WILLIAM FARLOW

V.

HARRIS METHODIST FORT                                     APPELLEES
WORTH HOSPITAL AND TEXAS
HEALTH RESOURCES, INC.

------------

FROM PROBATE COURT NO. 2 OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

This is a medical malpractice case in which appellants are attempting to impute liability for a doctor's negligence to both the hospital where he

performed surgery and the hospital's parent company.  In six points, appellants challenge (1) the partial summary judgment on their respondeat superior and gross negligence allegations, (2) the directed verdict on their vicarious liability claim based on ostensible agency, and (3) the exclusion of evidence that they contend is material to their claims.  We affirm.

## II.  Factual and Procedural Background

Appellants Emily Farlow[1] and her husband Lee William Farlow filed a medical malpractice suit on March 31, 2005 against John L. Fewins, M.D.; John L. Fewins, M.D., P.A.; Harris Methodist Fort Worth Hospital (the Hospital); and Texas Health Resources, Inc. (THR).[2]  They alleged that Lee went to the emergency room at the Hospital on April 15, 2004 because of headaches, and the next day Dr. Fewins, who was the on-call otolaryngology (ENT) specialist at the hospital, recommended performing an endoscopic transnasal biopsy. They further alleged that Dr. Fewins penetrated Lee's skull during the procedure, causing permanent damage to his central nervous system.

---

[1] Emily sued in the following capacities:  individually, as next friend of her son Andrew Joseph Farlow and her daughter Lauren Catherine Farlow, and as guardian of the person and estate of her husband, Lee William Farlow.

[2] THR is the Hospital's parent company; it is a nonprofit that also owns several other hospitals.  THR and the Hospital are referred to collectively in this opinion as "Harris."

2

The Farlows asserted that Dr. Fewins was both negligent and grossly negligent in performing Lee's surgery. They also asserted that Harris was vicariously liable for Dr. Fewins's actions because he was an employee. In the alternative, they claimed that Dr. Fewins was Harris's ostensible agent because Harris held out the physicians practicing at the Hospital as employees. The Farlows also claimed that Harris breached a duty to provide Dr. Fewins with the appropriate equipment necessary to safely perform the procedure.

Harris filed a combined traditional and no-evidence motion for partial summary judgment on the Farlows' vicarious liability claims. Harris contended that there was no evidence, or no genuine issue of material fact, that it employed Dr. Fewins or that he was acting within the course and scope of such employment in treating Lee. According to Harris, "[t]he evidence establishes that Dr. Fewins was an independent contractor engaged in the private practice of medicine, and . . . there is no factual or legal basis to support [the Farlows'] allegation that [Harris] should be vicariously liable for any alleged negligence of Dr. Fewins." Harris also moved for summary judgment on the ground that Dr. Fewins was not its ostensible agent. The trial court denied the motion in an order dated August 1, 2007.

Before the trial court ruled on the first motion for partial summary judgment, the Farlows filed a First Amended Original Petition, alleging for the

3

first time claims of fraud and negligent misrepresentation against Harris. Harris moved for partial summary judgment on these newly pled claims as well as the direct negligence and vicarious liability claims that it had previously moved for summary judgment on. However, before the trial court could rule on the second motion, the Farlows filed a Second Amended Petition deleting the fraud and negligent misrepresentation claims and adding allegations that Harris was also grossly negligent because it had ratified Dr. Fewins's actions and because Dr. Fewins was acting in a managerial capacity when he performed Lee's surgery. Thus, Harris, with the agreement of the trial court and the Farlows, again moved for summary judgment on traditional and no-evidence grounds, based on the claims in the Farlows' Second Amended Petition.

Harris alleged the following grounds for summary judgment:

- The Farlows' theory of vicarious liability based upon respondeat superior fails because Dr. Fewins was an independent contractor and not Harris's agent or employee.

- Alternatively, the Farlows cannot produce any evidence that Harris had the right to control the details of Dr. Fewins's work.

- The Farlows' theory of vicarious liability based upon ostensible agency fails because Harris has not held out Dr. Fewins as its agent, nor knowingly permitted Dr. Fewins to hold himself out as its agent.

4

- Alternatively, the Farlows cannot produce any evidence that Harris held out Dr. Fewins as its agent, or knowingly permitted Dr. Fewins to hold himself out as its agent.

- Because the Farlows cannot establish any type of agency or employee relationship between Harris and Dr. Fewins, Harris cannot be held liable for gross negligence.

- Alternatively, Harris did not authorize or ratify the actions of Dr. Fewins.

- In the further alternative, the Farlows cannot present any evidence that Harris authorized or ratified Dr. Fewins's acts.

- Alternatively, Dr. Fewins is not a manager of Harris.

- In the further alternative, the Farlows can present no evidence that Dr. Fewins is a manager of Harris.

- The Farlows can present no evidence of either the objective or subjective components of gross negligence.

While the third motion for partial summary judgment was pending, the Farlows filed a Third Amended Petition, in which they deleted their direct negligence claims against Harris. Instead, they added additional factual support for their allegation that Harris had committed gross negligence through the actions of its agent, Dr. Fewins.

The trial court granted Harris's motion for summary judgment on the Farlows' respondeat superior and gross negligence theories of liability, as set

forth in the Third Amended Petition.[3] But it denied Harris's motion in all other respects. Accordingly, only the ostensible agency theory of vicarious liability against Harris proceeded to trial, along with the Farlows' claims against Dr. Fewins.

After the Farlows rested, Harris moved for a directed verdict on the ostensible agency claim, which the trial court initially denied. But Harris reurged its motion after the defense rested, and the trial court granted it. As a result, the trial court entered a take-nothing judgment in Harris's favor.[4] This appeal followed.

### III. Partial Summary Judgment—Respondeat Superior

In their first point, the Farlows challenge the trial court's partial summary judgment on their respondeat superior claims against Harris. Specifically, they contend that there are genuine issues of material fact as to whether Dr. Fewins was Harris's employee or agent because (1) Harris controlled, or had the right to control, his medical practice by contract, (2) Dr. Fewins's status as an agent or independent contractor is a fact question not appropriate for summary judgment, (3) there was more than a scintilla of evidence that Dr. Fewins was

---

[3] The trial court did not specify whether it was granting the motion on traditional or no-evidence grounds.

[4] The Farlows had entered into a high-low settlement agreement with Dr. Fewins, which the trial court incorporated into its judgment.

6

acting within the scope of his employment with Harris, and (4) there was more than a scintilla of evidence that the procedure he performed on Lee was in furtherance of Harris's business.

## A. Standard of Review

A no-evidence summary judgment is proper if the nonmovant fails to bring forward more than a scintilla of probative evidence that raises a genuine issue of material fact as to an essential element of the plaintiff's cause of action for which the defendant contends no evidence exists. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied); *see* Tex. R. Civ. P. 166a(i). A traditional summary judgment is proper if a defendant conclusively negates at least one of those essential elements. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c). When reviewing both a no-evidence and traditional summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798.

**B. Applicable Law**

Under the doctrine of respondeat superior, an employer may be vicariously liable for the negligence of its agent or employee who was acting within the scope of employment even though the employer did not personally commit a wrong. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002); *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 713 (Tex. App.—Fort Worth 2006, no pet.). But a person or entity that hires an independent contractor is generally not vicariously liable for the tort or negligence of that person. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947; *Enserch Corp. v. Parker*, 794 S.W.2d 2, 6 (Tex. 1990); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). For example, a hospital is ordinarily not liable for the negligence of a physician who is an independent contractor. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948; *Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675, 684 (Tex. App.—Dallas 2000, no pet.).

The right of control is the "supreme test" for determining whether a master-servant relationship exists. *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 847 (Tex. App.—Fort Worth 2006, no pet.). In determining whether a worker is an employee or

8

independent contractor, the focus is on who has the right to control the details of the work. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist*., 176 S.W.3d 330, 336 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd). An independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and methods without submitting to the control of the other person as to the details of the work. *Indus. Indem. Exch. v. Southard*, 138 Tex. 531, 160 S.W.2d 905, 907 (1942); *Schievink v. Wendylou Ranch, Inc*., 227 S.W.3d 862, 866 (Tex. App.—Eastland 2007, pet. denied).

A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964); *Bell*, 205 S.W.3d at 713–14; *Weidner v. Sanchez*, 14 S.W.3d 353, 373 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Evidence that the parties did not intend for an independent contractor relationship can come from the contract itself, i.e., whether, despite language describing the relationship as an independent contractor relationship, other contract language evidences such a

right of control that the relationship is actually that of employer/employee. *Newspapers, Inc.*, 380 S.W.2d at 591—92; *Bell*, 205 S.W.3d at 713–14. It can also come from extrinsic evidence, such as instances of actual control by the principal sufficient to show that the true agreement of the parties vested a right of control establishing an employment relationship. *Newspapers, Inc.*, 380 S.W.2d at 590–92 ("[T]he 'right to control' remains the supreme test and the 'exercise of control' necessarily presupposes a right to control which must be related to some agreement expressed or implied."); *Bell*, 205 S.W.3d at 713–14. In such cases, the exercise of control is evidentiary only and "must be so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work." *Newspapers, Inc.*, 380 S.W.2d at 592.

We may consider several factors in determining the extent of the right of control: (1) the independent nature of the person's business; (2) the person's obligation to furnish necessary tools, supplies, and material to perform the job; (3) the right to control progress of the work, except as to final results; (4) the time for which the person is employed; and (5) the method of payment, whether by time or by the job. *Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580,

584–85 (Tex. 2005); *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002).[5] To trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose. *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998); *Exxon Corp.*, 867 S.W.2d at 23; *Omega Contracting*, 191 S.W.3d at 847.

---

[5] The parties each point us to a different test to determine the relationship between Harris and the Farlows.  Harris contends that *St. Joseph Hospital* sets forth a physician-specific independent contractor test that displaces prior case law:  whether there has been a "benefit to the defendant and . . . right of control."  *St. Joseph Hosp.*, 94 S.W.3d at 537.  But this test applies to only one of several vicarious liability theories the plaintiff in that case pled as an *alternative* to respondeat superior.  *Id*. at 537.  The "nonemployee on a mission" theory of liability is for "respondeat superior liability *outside the employment context*."  *Id*. at 537 (emphasis added); *Omega Contracting*, 191 S.W.3d at 847; *see* Comm. on Pattern Jury Charges, State Bar of Tex., *Tex*. *Pattern Jury Charges: General Negligence and Intentional Personal Torts* PJC 7.10 (2008).  The Farlows did not plead this nonemployment-based theory of vicarious liability; thus, this test is not applicable and does not displace the *Newspapers, Inc.* contract-between-the-parties-controls-absent-evidence-otherwise test.

Conversely, the Farlows urge that we use the five-factor test set out in *Limestone Products Distribution, Inc.*, 71 S.W.3d at 312, to the exclusion of the *Newspapers, Inc.* test.  But the *Limestone* factors assist us only in determining whether the evidence of right of control despite the explicit contract language raises a fact question as to whether Dr. Fewins was an employee.  *See Farrell v. Greater Houston Transp. Co.*, 908 S.W.2d 1, 3 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (recognizing that *Newspapers, Inc*. controls respondeat superior analysis when contract provides for independent contractor status but then employing *Limestone* factors to analyze whether evidence of control was sufficient to overcome contract language).

11

The right to control is ordinarily a question of fact; but whether a contract gives a right to control is generally a question of law. *Omega Contracting*, 191 S.W.3d at 847; *EPGT Tex. Pipeline*, 176 S.W.3d at 336. In addition, if the controlling facts are undisputed, whether the relationship that exists is that of an employee or of an independent contractor is a question of law. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *EPGT Tex. Pipeline*, 176 S.W.3d at 336.

**C.  Analysis**

The Farlows point to both the rights of Harris as set forth in several contracts between the Hospital and Dr. Fewins and actual instances of control exercised by the Hospital as evidence that the true relationship between the parties was that of an employer and employee rather than an independent contractor relationship.  Accordingly, we will examine the evidence of both.

**1.    Did the Hospital Retain Right of Control by Contract?**

**a.  The Contracts**

Dr. Fewins signed several agreements with Harris, which were in effect when he operated on Lee:  a Physician Recruitment Agreement with Sign-On Bonus/Relocation Reimbursement Addendum and Collections Guarantee Addendum; a Secured Promissory Note; and a Security Agreement.  Phyllis Norman, an administrator employed by THR, explained the purpose behind the

12

Hospital's entering into these agreements. According to Norman, she is responsible, in part, for making sure the Hospital has sufficient on-call coverage for certain physician specialties. In 2003, one of the specialities for which she was responsible was otolaryngology. At that time, the Hospital had only two on-call ENT physicians and were about to lose at least one. So Norman began to look for a new ENT to provide at least one-third of the on-call coverage for the Hospital; she expected that the new on-call doctor would provide coverage for at least one week every three weeks. The Hospital would provide the new doctor with financial assistance in the form of a loan to set up his or her practice in the Fort Worth area in exchange for the doctor's agreeing to apply for active staff privileges at the Hospital and to provide the Hospital with on-call coverage in his or her specialty for a certain minimum time;[6] in this way, the Hospital could bring new physicians to its coverage area. Norman explained that Harris did not get involved in setting up the doctor's practice, however.

Norman received Dr. Fewins's resume and called him to see if he was interested in interviewing with the Hospital. He was in the process of finishing a four-year residency program with University of Texas Medical Branch at San Antonio. After talking with him, she set up an interview with her and other

---

[6] Norman explained that new doctors typically needed help relocating because they owed money on student loans.

administrators; she also facilitated meetings with Dr. Fewins and the two other ENTs who provided on-call coverage to the Hospital. The Hospital reimbursed Dr. Fewins for his travel expenses. After Dr. Fewins agreed to locate his practice in Fort Worth with the Hospital's assistance, he signed the above-listed contracts. The Hospital paid him a bonus and reimbursed his moving expenses;[7] it reported these amounts to the IRS on a form 1099.

The Physicians Recruitment Agreement provides that "[t]he objective of Hospital in the Agreement is to provide incentives to [the doctor] to practice medicine and for [the doctor] to provide professional services to patients in the Community [defined as the Hospital's service area]." It expressly states that

> [a]t all times during the term . . . [the doctor] is and shall be an independent practitioner and not a servant, agent, or employee of Hospital. Hospital and [the doctor] shall further agree that nothing contained herein shall be deemed to create any type of employment, agency, servant, partner, or joint venture relationship between [the doctor] and Hospital.

The agreement further provides that the doctor "shall exercise his/her own independent medical judg[]ment in his/her practice of medicine and in the performance of all professional services for his/her patients."

---

[7] All amounts paid by the hospital to Dr. Fewins are in separate sealed parts of the clerk's record and are redacted from documents in the unsealed part of the clerk's record.

### b. Contract Requirements That the Farlows Allege Show a Right of Control Sufficient to Establish Employment Relationship

Despite the language stating that Dr. Fewins was to be an independent contractor of the Hospital, the Farlows contend that the following obligations in the Physician Recruitment Agreement show that the Hospital had a right to control Dr. Fewins's activities to an extent that at least creates a fact issue as to whether he was acting as the Hospital's employee when he operated on Lee:

- Dr. Fewins was obligated to provide one third of the Hospital's emergency room ENT coverage unless otherwise agreed, in accordance with the Hospital's medical staff bylaws, rules, regulations, or policies.[8]

- The Agreement required Dr. Fewins to "engage in the full-time *private* practice of medicine in the Community . . . defined as . . . availability to see patients at least 35 hours per week for 48 weeks during any calendar year." [Emphasis added.]

- Dr. Fewins agreed to maintain complete and accurate medical record documentation on each of the patients he saw at the Hospital.

- Dr. Fewins was required to obtain and maintain active staff privileges at the Hospital.

---

[8] Norman explained that Dr. Fewins was required to be on-call once every three weeks.

15

• Dr. Fewins agreed not to enter into a private practice recruitment or similar agreement with any other hospital or health care system, or to accept money for such a recruitment.

• Dr. Fewins agreed to "provide a reasonable amount of care for indigent patients both in [his] office and to Hospital inpatients" and to provide services without discrimination as to the "payor source, including but not limited to Medicare and Medicaid."

• Dr. Fewins was required to, at the Hospital's reasonable request, participate in any health maintenance or preferred provider organization, accountable health plan, or network in which the Hospital participates.

• The agreement provided that Dr. Fewins would cooperate with the Hospital's compliance officer as needed to carry out the corporate compliance program.

• Dr. Fewins agreed to provide, during the term of the agreement and for three years thereafter, any information reasonably requested by the Hospital related to his professional services and collections for audits, tax filings, or other financial or regulatory matters.

• Dr. Fewins agreed to provide the Hospital upon request with all authorizations necessary to provide the Hospital information regarding expenses incurred by Dr. Fewins in setting up his practice.

16

The term of the Physician Recruitment Agreement was four years, beginning on the date Dr. Fewins was granted staff privileges. Norman testified that he probably obtained his initial temporary privileges around August 2003. The agreement provided for early termination upon breach by Dr. Fewins, such as his failure to maintain active staff privileges at the Hospital.

The Sign-On Bonus/Relocation Reimbursement Addendum to the Agreement stated that if Dr. Fewins

> fails to obtain or maintain privileges as a member of the Medical Staff of Hospital, or to maintain the Full-time Practice of medicine in the Community as required by Paragraph 1 of the Physician Recruitment Agreement, [Dr. Fewins] shall immediately, upon demand, pay to Hospital the unamortized amount of the total sums paid or reimbursed to [him] pursuant to this Addendum.

Additionally, the Collections Guarantee Addendum provided that during the first year after the effective date of the Physician Recruitment Agreement, the Hospital would advance to Dr. Fewins a certain monthly amount that the Hospital had calculated was approximately what an ENT starting a private practice in the Fort Worth area would earn (the Guarantee Amount). Beginning with the second month, the Hospital would advance the same monthly amount, less the amount of Dr. Fewins's collections from that month; "collections" was defined as

> all cash collected by or on behalf of [the doctor] from patients or other payors for [the doctor's] medical services regardless of where

17

such services are provided or to whom, including emergency room coverage, and all amounts earned from [the doctor's] practice of medicine or from any other source concerning medical or medical related matters.

The guarantee was structured as a loan to Dr. Fewins, and the repayment thereof was secured by a Secured Promissory Note and Security Agreement. Dr. Fewins was required to provide the Hospital with a monthly report of all collections from his medical practice to facilitate payment of the monthly advances. At the end of the term, if the total of Dr. Fewins's collections plus advances from the Hospital during the term exceeded the Guarantee Amount, he was required to repay the Hospital for any amounts it had advanced. On the other hand, if the collections plus advances were less than the Guarantee Amount, the Hospital would pay Dr. Fewins the difference. Here, Dr. Fewins's collections plus advances from the Hospital exceeded the Guarantee Amount; thus, he had to repay the Hospital for those advances at the end of the term.

The Collections Guarantee Addendum also provided that after the initial one-year term, any amount the physician owed for advances would be forgiven each month when due, provided that no event of default had occurred under the Physician Recruitment Agreement. In other words, this provision allowed the Hospital to forgo repayment of the monthly amount due for advances so

18

long as the doctor continued to perform under the Physician Recruitment Agreement. Here, however, Dr. Fewins repaid all of the advances.

### c. Conclusion

Viewed in their entirety, the Physician Recruitment Agreement and its ancillary contracts evidence an intent by the Hospital to assist Dr. Fewins in setting up a private practice in the Hospital's service area and to provide Dr. Fewins financial assistance in setting up this private practice in the form of a loan (if his collections met the parties' expectations) or a guarantee (if his collections did not meet the parties' expectations). This arrangement provided the Hospital with a guaranteed one-third of its need for ENT on-call coverage for at least one year.[9] The provisions that the Farlows contend show a right of control over Dr. Fewins's practice are in reality for the purpose of ensuring that the recruited doctor could financially continue to practice in the Hospital's service area; otherwise, the Hospital would not be able to maintain this certainty of on-call coverage in that speciality, thus frustrating the very purpose of the agreement. *Cf. St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995)

---

[9] As Norman explained, the Agreement "defines what the expectations are both from the hospital standpoint and from the physician's standpoint in the community." Harris was thus "interested in seeing this physician develop his own practice within the community[,] . . . practice on a full-time basis, provide us with assistance with the emergency department call."

19

(holding that on-call status of physician, without more, does not establish that physician owes duty to patient); *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948–49 (declining to impose nondelegable duty on hospitals for malpractice of emergency room physicians).

The majority of the provisions that the Farlows point to as establishing a right of control over the details of Dr. Fewins's work—such as the obligation to provide financial records and to engage in his private practice at least 35 hours per week for 48 weeks during any calendar year—function to safeguard the money advanced by the Hospital, either by repayment of the money advanced or by continued emergency room coverage by the physician. Other provisions relate only to corporate compliance.[10] *See Bell*, 205 S.W.3d at 714, 721 (holding that requiring a worker to comply with applicable laws, regulations, and safety requirements does not show a right of control over the details of how a worker performs his or her job).

As to the provision requiring Dr. Fewins to participate in any HMO, PPO, or health care organization the Hospital participates in, Norman explained that this is good for the patients, and Dr. Fewins was not required to sign up for the over 100 plans the Hospital participated in at that time. She explained that he

---

[10] For example, Norman testified that the doctors are required by law to comply with the Hospital's documentation requirements.

only needed to comply with any reasonable request by the Hospital to participate in any such plan, but she was not aware that the Hospital had ever made such a request of Dr. Fewins. Additionally, she stated that the new doctors usually found out over the course of time and by word of mouth which plans were the best ones and that the best plans might vary by hospital. Accordingly, while this provision attempts to control a desired result—i.e., to facilitate the treatment of patients, processing of claims, and payment to the doctors and Hospital for services rendered—it does not show a right to control the details of Dr. Fewins's work to the extent that it shows the independent contractor language is a mere sham.

Additionally, although Dr. Fewins was required to maintain active staff privileges at the Hospital, the agreement specifically states that he was not prohibited from applying for or maintaining privileges at any other hospital or utilizing or admitting patients to any other hospital. Moreover, the agreement specifically provides that Dr. Fewins was not required to "admit patients to Hospital or to utilize Hospital to provide inpatient, outpatient or any other services to patients or otherwise generate business for Hospital." Norman testified that simply having staff privileges did not mean a physician had to take on-call coverage. For instance, physicians over the age of sixty could maintain active staff privileges without participating in on-call coverage.

The Farlows point out that under the Hospital's Medical Staff Bylaws, Dr. Fewins was contractually obligated to respond when the emergency room doctor who saw Lee referred the case to Dr. Fewins as the on-call ENT. Specifically, he was required under the Bylaws to do the following:

> (b)    provide for continuous care of his patients by personally attending the patients or by arranging for coverage for his patients by another Member of the Medical Staff, who holds the same or substantially the same clinical privileges as determined by the Credentials Committee. Each Member shall arrange for such coverage at any time he is not available even if he currently has no patients who are in the Hospital;
>
> . . . .
>
> (f)    not delegate responsibility for diagnosis or care of Hospital patients to a practitioner who is not a member of the Medical Staff with requisite privileges; [and]
>
> . . . .
>
> (k)    cooperate with Members, nurses, Hospital Administration and others so as not to adversely affect patient care and/or the orderly administration of the Hospital.

But these requirements are likewise results-oriented only, evidencing an intent that no patients being seen at or admitted to the Hospital are left without care by a responsible doctor having privileges at the Hospital. They do not direct how or to whom the doctor must delegate such care; they simply ensure that no patient will be medically unattended while at the Hospital. Moreover,

22

the Bylaws are adopted by the governing Medical Board, made up of doctors holding staff privileges at the Hospital: the Chief of Staff, Vice Chief, Communication and Performance Director, and Chiefs of each division.[11] The Bylaws apply equally to on-call physicians with staff privileges as well as physicians with staff privileges who admit their patients to the Hospital after seeing them in their own offices.

Accordingly, even considering the undisputed evidence of the contract provisions pointed to by the Farlows, there is no evidence raising a fact issue as to whether the contract between the Hospital and Dr. Fewins was a mere sham or subterfuge designed to conceal the true legal status of the parties.

## 2.    Extrinsic Evidence

According to the Farlows, evidence of actual instances of control by the Hospital over Dr. Fewins's practice also shows that the true relationship between the parties was an employment relationship. They specifically point to the following: evidence that (1) Dr. Fewins used the Hospital's equipment instead of his own to perform the surgery on Lee; (2) a Hospital employee, the supervising nurse, assigned the room and scheduled the surgery; and (3) the Hospital employed the nurses assigned to assist Dr. Fewins with the surgery,

---

[11] The Hospital President and Risk Manager also serve on the Medical Board, but they do not have the power to vote.

23

and Dr. Fewins did not schedule or request those nurses; instead, he simply had to work with the nurses that the Hospital scheduled to work in the operating room that day.[12]

Additionally, the Farlows point to Norman's deposition testimony that when Dr. Fewins was on-call, he was required to respond, at least by telephone, within thirty minutes after being called by the emergency department. According to Norman,

> If you're on call . . ., whether it's a week or for a day, your responsibility is to, when called by the emergency department, to respond within 30 minutes, at least on the phone to talk with them within 30 minutes and then discuss the case, determine if there is a need to physically go to the hospital, see the patient. If it's a surgical specialty, maybe to take a patient to surgery or perform a procedure within the emergency department. Or another option would be after talking with the emergency department physician, to determine that this is something, for instance a nose bleed that could be packed and the patient sent to the physician's office either that day or the next day.

---

[12] Although the Farlows maintain that the Hospital scheduled the surgery to meet its time and needs, the deposition testimony of Dr. Fewins, which they cite, is clear that he wanted to start the procedure at 5:00 p.m., but he could not start at that time because there was already a trauma procedure in the operating room; however, he could have started Lee's surgery that evening if he had wanted to. Instead, not knowing how long the trauma would take, *he* decided to do the surgery on Saturday morning, depending on availability of the operating room. The Farlows presented no evidence contradicting this testimony.

The Farlows characterize this testimony as meaning that Dr. Fewins was required by the Hospital to "consult with and treat the patients at [the Hospital] whenever necessary."

Although we agree that this language shows that Dr. Fewins had an obligation to respond when consulted by the emergency room, this obligation applied to all doctors with staff privileges who participated in on-call coverage at the Hospital, according to the Rules and Regulations promulgated by the medical staff. Dr. Fewins testified that he had not actually been scheduled to be on-call the week he performed Lee's surgery; he was substituting for another of the on-call ENTs. According to Dr. Fewins, although he had stated in the past that the on-call schedule was set by the medical affairs department of the Hospital, he meant that, ultimately, the schedule was "put out and published by" the Hospital, but the doctors informally determined, on their own, when they would each take on-call coverage. He testified, "[I]t's a combination of us as a team, as a community . . . . It's an unwritten agreement." Thus, the doctors themselves would "ultimately alert the medical affairs office as to how [they] propose it [the on-call schedule] be divided up," and they would also have the right to trade with any of the other doctors on the list. Thus, we do not believe that these obligations by on-call physicians at the Hospital show that the Hospital exercised actual control over the details of Dr. Fewins's work

25

that was "so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of" Lee's surgery, "the parties by implied consent and acquiescence had agreed that [the Hospital had] the right to control the details of the work." *Newspapers, Inc.*, 380 S.W.2d at 592.

Moreover, considering the *Limestone* factors, nothing here shows that the facts the Farlows point to as evidencing actual instances of control interfered with the independent nature of Dr. Fewins's work. Dr. Fewins testified that although he used the Hospital's tools in performing the surgery, he and other doctors were free to use their own tools. The evidence also shows that patients paid Dr. Fewins directly for his services and that the Hospital billed separately for its services. Although there is evidence that the Farlows never received a bill from Dr. Fewins for the surgery, but they did from the Hospital, there is no indication that any of the Hospital's bills purport to recover for Dr. Fewins's services. Additionally, Dr. Fewins was on-call only once every three weeks for one week at a time, and he was not required to have any presence at the Hospital during that time unless he was specifically contacted by the emergency room about an ENT patient. Further, we have already explained that the patient care requirements imposed by the contract and the Hospital's Bylaws are results-oriented and not related to the control of the details of Dr. Fewins's work. Accordingly, even considering the *Limestone* factors, the

26

Farlows have not shown that the Hospital exercised a right of control sufficient to raise a fact issue on their respondeat superior claim.[13]

Finally, the Farlows urge in their reply brief that only "some control" is required to establish vicarious liability for the acts of an independent contractor, in accordance with the Restatement (Second) of Torts and *Redinger*, 689 S.W.2d at 418. But the Farlows did not plead this theory of vicarious liability, only respondeat superior and ostensible agency. Nor did they raise this theory in the summary judgment proceedings. *See Brookshire v. Longhorn Chevrolet Co.*, 788 S.W.2d 209, 213 (Tex. App.—Fort Worth 1990, no writ) (holding that

---

[13] The Farlows rely on language in *Dalehite v. Nauta*, stating that the argument that the hospital did not control "the details of the diagnosis or treatment" by the doctor "proves too much. If [this] argument were correct, then no physician could ever be an employee, not even via ostensible agency." 79 S.W.3d 243, 245–46 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). But although that is the same argument urged by Harris here—one which we need not address based on our disposition—that case is distinguishable on its facts because Dr. Nauta

> was chairman of the UTMB department of neurosurgery; worked full-time as a professor of neurosurgery, treating patients and instructing medical students at UTMB; signed an employment contract, was paid a salary, and provided with employee benefits and insurance; and received an office, support staff, and equipment necessary to do his work from UTMB. Appellants themselves alleged in their petition that Nauta was an employee of UTMB, so that UTMB was liable for his actions.

*Id*. at 245.

27

appellate court can only consider material on file with trial court as of time summary judgment granted).

Accordingly, we conclude and hold, based on the undisputed facts and the appropriate standards of review, that the trial court did not err by granting partial summary judgment as to the Farlows' respondeat superior claims against Harris.

## IV. Ostensible Agency

In their second issue, the Farlows challenge the trial court's directed verdict on their vicarious liability claim based on ostensible agency.

### A. Standard of Review

A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent or (2) when the evidence is insufficient to raise a material fact issue. *See Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Hogue v. Propath Lab., Inc.*, 192 S.W.3d 641, 646 (Tex. App.—Fort Worth 2006, pet. denied). In reviewing a directed verdict, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

If the question to be decided is whether the party opposing the directed verdict raised a material fact issue, we consider all the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences; we give the opposing party the benefit of all reasonable inferences created by the evidence. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004). If we determine that any conflicting evidence of probative value raises a material fact issue on any theory of recovery, then the directed verdict is improper because such an issue is for the jury to resolve. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

**B. Applicable Law**

An individual or entity who engages an independent contractor, and thus would not normally be vicariously liable for the independent contractor's negligence, may nevertheless act in a manner that makes the person or entity liable for the independent contractor under the doctrine of ostensible agency. *See Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947. Liability may be imposed under the doctrine of ostensible agency in circumstances in which the principal's conduct should equitably prevent it from denying the existence of an agency. *Id*.; *Coker v. Cramer Fin. Group, Inc*., 992 S.W.2d 586, 595 (Tex. App.—Texarkana 1999, no pet.). Ostensible agency in Texas is based on the

29

notion of estoppel, that is, a representation by the principal causing justifiable reliance and resulting harm. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948; *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984).

Texas courts have applied these basic agency concepts to many kinds of principals, including hospitals. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948. A hospital may be vicariously liable for the medical malpractice of independent contractor physicians when plaintiffs can establish the elements of ostensible agency. *Id*. The elements of ostensible agency are that (1) the principal, by its conduct, (2) caused a third party to reasonably believe that the putative agent was an employee or agent of the principal, and (3) that the third party justifiably relied on the appearance of agency. *Id*. at 948; *Garrett v. L.P. McQuistion County Hosp.*, 30 S.W.3d 653, 655–56 (Tex. App.—Texarkana 2000, no pet.); Restatement (Second) of Agency § 267 (1958).

**C.    Evidence Presented at Trial**

   **1.    Emily Farlow**

      **a.    Events at Hospital**

Emily Farlow testified that she did not see Lee in the Hospital the night he went to the emergency room because she had to stay home with their two children. But when she helped load him into his parents' car for them to take him to the Hospital, he was "incapacitated" and could not sign any forms; "[h]is

30

headache was so bad he couldn't even talk. . . . [T]here's no way he could have concentrated and focused and actually read something." She testified that Lee's mother said the Hospital had given him "tons of pain medication stronger than morphine."

Emily joined Lee at the Hospital the next morning. She stayed with him until around dinnertime. While Emily was at the Hospital, Lee was incoherent most of the time and "pretty much out of it." Lee was not able to participate in giving one of the nurses his medical history. That afternoon a nurse told them that "Lee's surgery had been rescheduled until Saturday morning because the operating room was so backed up."

Emily did not have personal knowledge of any discussions between Lee and the nursing staff or any doctors when Lee went into the Hospital on April 15 because she was not there, nor was she there on the 16th when Dr. Fewins saw Lee. When cross-examined about the Hospital's records, Emily admitted that none of the records said that Lee was incoherent.

Emily was not aware exactly how Dr. Fewins got involved in Lee's care. A physician from Lee's nephrologist's practice actually admitted Lee to the Hospital. When asked if, at the time Lee was suffering the headache, the doctors who would be treating him were employees or independent contractors, she said, "yes." Emily thought Dr. Fewins was an employee because "[w]e

31

went to the emergency room not knowing what kind of doctor we needed. We just needed care. And the emergency room, who I felt was the hospital, sent Dr. Fewins to us, so I thought he was an employee of the hospital." She said there was no choice in who was to perform the operation and that the Hospital selected Dr. Fewins to perform it. When asked if Dr. Fewins's independent contractor status would have kept her from allowing him to treat her husband, Emily answered,

> I don't know if it would have kept me, but I know that when they said that, you know, an ENT is going to come and do surgery that day, I didn't question that ENT because I had full faith that the hospital had only the best, most-qualified doctors there to care for them so I put all of my trust in that.

Emily testified that on the day of the surgery, she was all alone in the surgical waiting area until Dr. Fewins came out to talk to her. He was wearing scrubs but she does not recall him wearing a badge. At that time, Emily signed a consent form for an angiogram for Lee; she did not notice whether it said the doctors were not employees of the Hospital.

### b. Consent Forms

Harris introduced a "Universal Consent for Treatment" form that Lee signed when he was admitted to the emergency room on April 15, 2004. A paragraph in the middle of the page states as follows:

32

**Independent physicians.** I acknowledge that the doctors taking part in my care do not work for the Hospital. They are engaged in the private practice of medicine, and are not employees, servants or agents of the Hospital. In addition to my attending doctor, other doctors who may take part in my care may include radiologists, pathologists, anesthesiologists, neonatologists, cardiologists, emergency physicians and other specialists. I acknowledge that the Hospital is not responsible for the judgment or conduct of doctors who treat or provide a professional service to me. The exception to this is that some medical residents -- doctors taking part in a program of post-graduate medical education under the supervision of more experienced physicians -- are employees of the Hospital.[14]

Harris questioned Emily as to whether it would be reasonable for a doctor to rely on a signed consent form as a patient's representation that he or she had read it; she said no. Although Emily was not there when Lee signed the document, she suspected that he did not read it. When asked if the signature was Lee's, she said, "It looks like an impaired version of his signature, obviously in distress." The letters were scrunched up, and it was not as "free-flowing" as his normal signature.

Harris also introduced a Hospital consent form that Lee had signed about three weeks before the surgery. Lee's nephrologist had biopsied his kidney at the Hospital, and Lee signed the same consent form that included the language quoted above. Emily was not with Lee that day, so she did not know his

---

[14] Emily testified that no one represented that Dr. Fewins was or was not in training; regardless, she did not think he was a doctor in training.

33

condition when he signed the form. But she also testified that the language on the form says only that the doctors participating in "your care" are not employees; the only doctor she knew who was participating in Lee's care for that visit to the Hospital was his nephrologist, who had his own office and practice, so she knew he was not an employee. According to Emily, "in my mind, it was the belief that when you go see a doctor at their office, they're not affiliated with the hospital, they're not employees of the hospital. But when you go to the hospital to see a doctor, that they are employees of the . . . hospital." She also thought Lee's nephrologist's partner, who admitted Lee to the Hospital, was not a Hospital employee because she knew him as the outside doctor's partner. Her understanding of how Dr. Fewins came to treat Lee was that the doctor who saw Lee initially in the emergency room, Dr. Chase, "looked on the wall of the emergency room for the ENT specialist and [Dr. Fewins's] name was there." According to Emily, she and Lee had no input into who would treat Lee; both Dr. Fewins and Dr. Ellis, the neurologist who treated Lee after the surgery performed by Dr. Fewins, were selected by the Hospital.

Harris additionally introduced consent forms that Emily signed when she went to the Hospital for a lactation consultation after her son was born and when she was admitted to the Hospital to give birth to her daughter. These

34

forms contain independent contractor language substantially similar to that quoted above. But Emily said she did not read these documents, and she was in labor when she signed the second one.

The defense also questioned Emily about a consent form Lee signed on the 17th, before his surgery. The form does not state that the physician is an independent contractor, but it likewise does not hold out the physician as an employee. It merely provides informed consent as to some of the risks of the surgical procedure that was to be performed.

Emily admitted that she did not know Lee's condition when he signed this form because she was not able to get to the Hospital until after Lee had been taken into surgery. She likewise did not know Lee's condition or how much drugs he had been given at that point. When she had been there with him in the emergency room on the 16th, the day before the surgery, he was "in and out," intermittently incoherent, not able to stand, and lying down when talking to her. She thinks this had to do with the pain medication as it wore off and took effect. However, when Emily talked to Lee by phone on the evening of the 16th, his headache was gone or almost gone, he was not in pain, and he was speaking normally.[15]

---

[15] Emily was not able to stay at the Hospital with Lee because she had to return home to care for their children. As far as she knew, there was no one

### c.  Why the Farlows Chose Harris

According to Emily, she selected the Hospital because Lee was going to see its doctors and she thought of the Hospital as the better hospital of those available. She did not know what type of doctor Lee needed, which is why she sent him to the emergency room. Emily testified that she understood that when you see a doctor at his or her office, and the doctor then schedules a procedure in the Hospital, that doctor is not an employee; however, she did not know whether Dr. Fewins had his own practice when he treated Lee at the Hospital.

### d.  "I Am Harris" Advertising Campaign

Emily testified that she decided to have her daughter at the Hospital and that she was influenced in that decision by the "I Am Harris" advertising campaign. According to Emily, she thought the doctors who worked at Harris hospitals were employees because "the pictures in the advertising portrayed people in lab coats, they have stethoscopes. . . . [T]hey look like doctors." She admitted that not all of the pictures portray people who look like doctors but that "some of these people are -- could be doctors."

> She believed the Hospital was different from other hospitals because [t]hey were willing to put their employees out there. They were backing them up by putting them on the billboard saying what

else there other than Lee and Dr. Fewins when Lee signed the form the morning of the surgery.

great quality they were, what great care you were going to get, and I really felt like they were putting their trust in their employees. And if they would do that, then I would too.

Emily testified that the advertising campaign also influenced her decision

to have her parents take Lee to the Hospital emergency room for his headache.

She stated,

> I didn't know what kind of doctor I needed. And I felt like the doctors were their employees of the hospital that they were putting out there saying trust us, we care, the doctors care, the nurses care, all the employees care, and they are of the utmost quality. They will take care of you. And I wanted to go where I was going to get a good doctor. . . . I needed a good doctor.

Emily thought the doctors in the Hospital's emergency room were employees

because "the people in their advertising campaign look like doctors. . . . We

were going to see the doctor in the hospital."

According to Emily, the Harris advertisements were even more critical in

her decision to send Lee to the Hospital than they were when they decided to

have their daughter there. She explained,

> [M]y belief, driving through town over all the time and looking at those ads, is that they are putting their trust - - they are putting their people up there saying our employees are the hospital and we will stand behind our employees. And the people in the ads[,] I didn't know that they were not doctors. They look like doctors, they look like nurses, they look like technicians. They're all the employees of the hospital that you go see at that hospital. And I trusted them because when you put your employees out there saying come see me for my employees, you are - - as a hospital

37

you are going to recruit and hire and train the very best people that you think are going to do the very best job. That's my belief.

She took a great deal of comfort from the advertisements.

Emily testified about the advertisements showing people who she thought looked like doctors. A part of one advertisement in particular reads, "The employees of Harris Methodist Hospitals are the hospital. They are the ones who help couples become parents. And patients become survivors. They are the nurses, lab technicians, admissions specialists, cafeteria servers and so many others who carry out each task with skill and compassion." Emily did not remember reading this specific part of the advertisement before Lee's surgery. Another part of the same advertisement says that the physicians on the hospital's staff are "independent practitioners who are not employees or agents of Harris Methodist Hospitals." But Emily said she had not read that part of the advertisement either.

Emily identified exhibits of pictures of Harris billboards as showing people who could be doctors. When asked whether the fact that a person on the billboard had a stethoscope necessarily meant that the person was a doctor, Emily answered, "I believed them to look like doctors." Harris admitted exhibits showing language on the billboards that specifically identifies the people on them as a respiratory therapist, lab technician, and other nonphysician

38

employees. Emily agreed that nothing in the advertisements says that the person being portrayed is a physician and that there was no advertisement that said people should go to Harris hospitals because the doctors are employees. But she was under that impression because of the appearance of the people in the advertisements.

Emily admitted that she and Lee never talked about the advertisements; she does not know what he assumed or inferred from them. She also admitted that she never saw Dr. Fewins's image on any Harris media.

Some of the advertisements introduced by the Farlows do not have language indicating that the doctors are not employees. For example, one of the images shows a woman who looks like a doctor because she is wearing a white coat and has a stethoscope. Emily testified that she relied on that image.

On cross-examination, Harris questioned Emily about one of the advertisements, which clearly says in big print, "I am an individual on the hospital's nursing team." Emily did not remember reading that billboard and said that she had never seen people who are not doctors wearing lab coats.

### 2. John Farlow

Lee's father John Farlow also testified regarding his impression of whether Dr. Fewins was a Hospital employee. According to John, he and his wife took Lee to the Hospital that night because they had had good experiences

there in the past and because of the "I Am Harris" advertising campaign. Lee never said that he wanted to go to the Hospital; it was just understood. But John agreed that he would have taken Lee to the Hospital regardless of the advertising.

John testified that when he and his wife took Lee to the Hospital, Lee was lying in the backseat in the fetal position in a lot of pain; he was not able to communicate other than to give yes and no answers. After John dropped Lee and his wife Marty off at the emergency room and parked the car and came back in, they had already been checked through the front desk. Lee was still in "extreme pain" and was not able to stand up; he was bent over with his knees on his elbows. He did not know about any paperwork Lee signed stating the doctors are independent contractors. He was never present for any discussions between Lee and any of the doctors.

On cross-examination, John testified that he had a long-standing relationship with the Hospital and had always had good experiences there and that he and his wife had even been patients there several times.

According to John, Harris's advertising played a part in the family's decision to take Lee to Harris even though John had just had surgery at Plaza Medical. He related,

40

I had seen the ads that said, "I Am Harris" and showed pictures of the staff and employees and doctors and nurses there at Harris. They were just one big happy family, and they represented themselves as a caring medical professional operation, so I felt like Lee would get a -- good medical care there.

According to John,

We knew that if . . . they were not going to stand behind their . . . staff, they would . . . not say "I Am Harris." They would say I am an independent contractor working at Harris Hospital. But they didn't say that. They . . . really implied and told us that . . . they were Harris Hospital. These employees, these doctors, nurses, they were Harris.

He thought the advertisements portrayed doctors because "when you see a person with a lab coat and with a stethoscope around their neck with a hospital badge you think they're doctors."

John admitted on cross-examination that he and Emily did not discuss the billboards and advertisements before April 15, 2004, the day he and Marty took Lee to Harris. He could not recall anything about in the advertisements he saw before April 15, 2004 other than the pictures and the "I Am Harris" slogan. In looking at the advertisements with the Farlows' attorney, he did not recognize any of the people in them.

### 3. Marty Farlow

Marty Farlow, Lee's mother, also testified about Lee's condition the night they took him to the Hospital. According to Marty, Lee was curled in the fetal

41

position in terrible pain; in the car, he was "all curled up, holding his head . . . [and] kind of muttering." At times, he was not making much sense. Once they got him to a room, they gave him medicine, but "it didn't do much," so they gave him morphine. He received another dose of pain medication after that.

## D. Analysis

The Farlows contend that the directed verdict was improper because sufficient evidence exists to show that the Farlows reasonably relied on Harris's affirmatively holding out its doctors as employees such that they were justified in believing Dr. Fewins was Harris's agent. They specifically point to the following as showing that Harris affirmatively held out its doctors as employees: (1) the "I Am Harris" advertising campaign, (2) "that Lee Farlow went to seek medical treatment from a hospital who, in turn, called in a doctor to treat Lee," (3) that Dr. Fewins wore scrubs that said, "Property of Harris Methodist Fort Worth Hospital" on them, (4) that Dr. Fewins had a Hospital badge that did not say he was an independent contractor, and (5) that a sign in one of the waiting rooms read as follows:

> THIS WAITING AREA IS GIVEN
> TO HONOR OUR DEDICATED
> PHYSICIANS, NURSES,
> AND MEDICAL STAFF
>
> PAUL AND VIRGINIA DORMAN

42

The trial court did not admit the writing on the scrubs and the waiting room sign into evidence at trial. Thus, we do not consider that evidence in our determination of whether the directed verdict based on the evidence at trial was proper. *See Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 411 (Tex. App.—Amarillo 2003, pet. denied) (holding that when directed verdict is reurged after defense presents its evidence, trial court must consider *all evidence before jury*, including evidence presented by defense). Additionally, our supreme court has rejected the Farlows' argument that ostensible agency arises simply by virtue of a doctor's on-call status. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 949; *Garrett*, 30 S.W.3d at 656. Thus, we are left with the advertising campaign and Dr. Fewins's Hospital badge as potential evidence showing an affirmative holding out that Dr. Fewins was Harris's agent.

Emily testified that she did not recall seeing Dr. Fewins's badge. When shown a picture purporting to be a copy of Dr. Fewins's badge, Emily again said that she did not recall seeing it, noting that "[b]y the time I met him, I wasn't paying attention to the badge." Additionally, there is no testimony that Lee ever saw or formed an opinion based on the badge. Thus, even assuming that the badge could be considered a holding out by the Hospital, there is no evidence that either of the Farlows reasonably relied on it in forming a belief about agency. *See Denton v. Big Spring Hosp. Corp.*, 998 S.W.2d 294,

43

296–97 (Tex. App.—Eastland 1999, no pet.) (noting, in holding that hospital did affirmatively hold out emergency room doctor as employee through radio advertisements, that patient testified he had never heard the advertisements).

Likewise, even if the advertising could be construed as an affirmative holding out by the Hospital to the Farlows that the doctors working there are employees rather than independent contractors (as evidenced by Emily's testimony that the advertising was confusing because she thought the people in lab coats were doctors),[16] the evidence shows that the Hospital took steps to alleviate any such impression by including language in its admission paperwork affirmatively stating that the doctors are independent practitioners rather than employees. Lee and Emily had both signed this paperwork in the past, and Lee signed such paperwork when he was admitted. The inclusion of such language in admission paperwork negates any prior holding out by a hospital, even if the patient did not read the paperwork. *See Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 950; *Valdez v. Pasadena Healthcare Mgmt., Inc.*, 975 S.W.2d 43, 45–46, 48 (Tex. App.—Houston [14th Dist.] 1998, pet.

---

[16] We note that at least some of the advertisements contain small print indicating that the doctors who work at the Hospital are "independent practitioners" and not employees; however, because not all of the advertisements so state, we will assume, for the sake of analysis, that the advertisements are confusing or misleading as to whether the individuals shown are doctors.

denied); *see also Garrett*, 30 S.W.3d at 657 ("A hospital must clarify for its patients its relationship with a doctor only to the extent that the hospital or the doctor has affirmatively held out that the doctor is its agent or employee."); *Denton*, 998 S.W.2d at 296–97 (holding that plaintiff did not raise fact issue to defeat summary judgment when defendant showed that plaintiff signed, but had not read, consent form stating that doctors were independent contractors). Moreover, there is no evidence that Lee saw or relied on the advertisements. *See Denton*, 998 S.W.2d at 297. Accordingly, we conclude and hold that the evidence presented at trial is insufficient to raise a material fact issue on ostensible agency; therefore, the trial court did not err by directing a verdict for Harris on that claim. We overrule the Farlows' second point.

## V. Ratification and Managerial Capacity

In their third point, the Farlows contend that the trial court erred by granting summary judgment on their allegation that Harris is liable for Dr. Fewins's gross negligence because it ratified his unauthorized act of penetrating Lee's skull and brain during the surgery. Specifically, the Farlows contend that Harris ratified Dr. Fewins's actions by (1) billing them for its services in connection with the surgery, (2) allowing Dr. Fewins to retain his staff privileges at the Hospital, (3) refusing to distance itself from Dr. Fewins during the trial, (4) failing to apologize for Lee's injury until the eve of trial, even

45

contending that Dr. Fewins had not violated the standard of care, and (5) allowing Dr. Fewins to continue treating Lee, including allowing him to be in the operating room when Dr. Ellis, a neurosurgeon, subsequently operated on Lee and letting him talk to the Farlow family in the waiting room during that surgery. In their fourth point, the Farlows contend that the trial court erred by granting summary judgment on their claim that Harris is liable for Dr. Fewins's gross negligence because he was acting in a managerial capacity as to the Hospital's employees—the nurses—when he performed Lee's surgery.

Harris contends that, regardless of whether summary judgment was proper as to the Farlows' allegations that Harris is liable for Dr. Fewins's gross negligence,[17] the point is moot because the jury found that Dr. Fewins was not grossly negligent and the parties have stipulated that even if this case is reversed, the damages verdict against Dr. Fewins will stand and not be retried.

Although the Farlows contended in their reply brief that the issue of ratification is not moot because Harris "could be liable in *negligence* . . . if ratification can be established," they did not plead ratification as a theory of vicarious liability for negligence; instead, they pled it solely as a basis for

---

[17] Because the Farlows did not go forward with their allegations of direct negligence against Harris, their allegations related to gross negligence could refer only to Harris's alleged vicarious liability for Dr. Fewins's gross negligence.

holding Harris liable for gross negligence upon the finding of an employee or agency relationship between Dr. Fewins and Harris. [Emphasis added.] Harris moved for summary judgment as to the pled allegations regarding ratification and managerial capacity on the grounds that they were pled as theories of gross negligence liability, and the Farlows acknowledged that their allegations were limited to gross negligence in their responses to the motion for summary judgment. Additionally, the trial court's summary judgment order specifically states that "any and all of [the Farlows'] claims for gross negligence against . . . Harris . . . are DISMISSED WITH PREJUDICE." Accordingly, because Harris could not be held liable for gross negligence even if we were to remand this case on the vicarious liability claims, we agree that the Farlows' points as to their allegations of gross negligence liability based on ratification and managerial capacity are moot. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) ("[A]ny prospective relief we might grant cannot help them."); *In re H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) ("[A]n issue may be moot if it becomes impossible for the court to grant effectual relief for any reason."). Accordingly, we overrule their third and fourth points.

47

## VI. Evidentiary Rulings

In their fifth point, the Farlows claim that the trial court abused its discretion by excluding testimony from Marty Farlow that when she and Lee were waiting for him to be taken into the emergency room, a woman whom she believed to be a Hospital employee told her that "the doctors that worked there were good doctors and they would take care of" Lee.

Harris objected to this testimony on hearsay grounds, contending that because Marty did not know the identity of the woman who made this statement to her, it could not be imputed to the Hospital and, thus, was not admissible as a statement against interest. It also objected on relevancy grounds.

### A. Standard of Review

A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v.*

48

*Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

## B.    Analysis

For a hearsay statement to be admissible under rule 801(e)(2)(D), the proponent of its admission must show that the statement was made by an employee or agent acting within the scope of authority. *Stensrud v. Leading Edge Aviation Servs. of Amarillo, Inc.*, 214 S.W.3d 98, 99 (Tex. App.—Amarillo 2006, no pet.); *Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 151 (Tex. App.—Fort Worth 2003, pet. denied) (holding that agency must be proven and may not be presumed). Here, Marty did not know the identity of the woman she talked to; she assumed the woman was an employee because she "presume[d] that everybody at the hospital works at the hospital." She did not know if the woman was a nurse, clerk, member of the administrative staff, or volunteer. She never saw whether the person was wearing a badge. Although Marty testified that she thought the woman was in charge of getting people back into the emergency room because people would talk to her and then go back into the emergency room, she could not testify as to any indicia of control or agency relationship necessary to impute any actions of this unidentified

49

woman to the Hospital. Accordingly, we cannot say that the trial court's ruling was arbitrary or unreasonable. *See Stensrud*, 214 S.W.3d at 100–01. Moreover, even if the trial court had abused its discretion in refusing to admit the evidence, the error would be harmless in light of the evidence that the Hospital's admissions forms disclaimed any agency relationship between Harris and the doctors who perform services at the Hospital. *See* Tex. R. App. P. 44.1(a)(1). We overrule the Farlows' fifth point.

### VII. Cumulative Evidentiary Rulings

The Farlows' sixth and final point complains about multiple trial court rulings excluding evidence that they contend, when evaluated cumulatively, resulted in the rendition of an improper judgment. In particular, the Farlows contend that the trial court reversibly erred by refusing to admit evidence of the following: (1) Marty's testimony regarding the woman who told her and Lee that the Hospital's doctors would care for him; (2) that the scrubs Dr. Fewins wears have the words, "Property of Harris Methodist Fort Worth," written on them; and (3) that the plaque on the wall in the emergency room references "*our* physicians, nurses, and medical staff." [Emphasis added.]

We have already determined that the trial court did not abuse its discretion by refusing to admit Marty's testimony and that even if it did, any error was harmless.

50

As to Dr. Fewins's scrubs, there is no evidence that Lee ever saw him wearing the scrubs or that he relied on the language on the scrubs in forming a belief that Dr. Fewins or Harris was holding Dr. Fewins out as Harris's agent. Although Emily testified that Dr. Fewins was wearing scrubs when he spoke to her in the waiting room after the surgery, there is no evidence that she was influenced by the language written on them. Thus, the trial court did not abuse its discretion by refusing to admit this evidence. *See* Tex. R. Evid. 401, 402; *Denton*, 998 S.W.2d at 296–97.

There is likewise no evidence that any of the Farlows saw or relied on the wall plaque in forming a belief as to whether Dr. Fewins was Harris's agent. Thus, we cannot say that the trial court abused its discretion in refusing to admit this evidence. *See* Tex. R. Evid. 401, 402; *Denton*, 998 S.W.2d at 296–97. Moreover, as with Marty's testimony, the scrubs and plaque evidence, even if considered to show an affirmative holding out by Harris of its doctors as employees, was negated by evidence that Harris included language in its admissions paperwork specifically disclaiming any such relationship. *See, e.g.*, *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 950; *Valdez*, 975 S.W.2d at 45–46, 48. Thus, even if the trial court abused its discretion by refusing to admit this evidence, we cannot say that any such error, cumulatively or individually, resulted in the rendition of an improper judgment. *See* Tex. R.

51

App. P. 44.1(a)(1); *Warrantech Corp. v. Computer Adapters Servs., Inc.*, 134 S.W.3d 516, 529 (Tex. App.—Fort Worth 2004, pet. dism'd).  We overrule the Farlows' sixth point.

## Conclusion

Having overruled the Farlows' six points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

DELIVERED:  May 7, 2008