

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-10-00047-CV**

DAVINA KELLY                                                                    APPELLANT

V.

CHURCH OF GOD IN                                                              APPELLEE
CHRIST, INC.

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

# MEMORANDUM OPINION[1]

------------

This is an appeal from a summary judgment for the Church of God in Christ, Inc. (COGIC) in this suit arising from a pastor's alleged acts toward a parishioner. In two issues, Davina Kelly, the former parishioner, contends that the trial court erred by granting both no-evidence and traditional summary judgments for COGIC. We affirm.

---

[1]*See* Tex. R. App. 47.4.

**Background Facts**

Kelly sued COGIC for (1) negligence, (2) negligent hiring, supervision, retention, and training, (3) intentional infliction of emotional distress, and (4) respondeat superior for the alleged acts of Sherman Allen, pastor of Shiloh Institutional Church of God in Christ.[2]  Kelly's Sixth Amended Petition alleged that around 1990, a group of female parishioners complained to a bishop of Texas Northeast Church of God in Christ, Inc. that Allen had been paddling them "in various stages of undress" and that COGIC took no action as a result of this complaint.  Kelly further alleged that around 2001, Allen "engaged in a pattern of egregious physical and sexual abuse against" her when she sought "spiritual counseling" from him.  According to Kelly's petition, these acts occurred both at the church and in the parsonage, and Allen instituted them "under the guise of pastoral counseling."

Kelly said that she wrote a letter to COGIC "specifically outlining this pattern of abuse" and that "COGIC pursuant to [its] own policy and procedures appointed two Bishops to lead an investigation into these allegations."  However, Kelly contended that COGIC took no further action until she filed suit, at which time COGIC purported to suspend Allen.

COGIC filed both no-evidence and traditional motions for summary judgment.  The no-evidence motion challenged Kelly's lack of evidence as to

---

[2]Kelly also sued Allen and Shiloh, but she dismissed both parties after settling with them.  Shiloh is now known as Shiloh Church.

2

(1) duty, breach, and causation for the negligence causes of action, (2) the intentional or reckless, extreme and outrageous conduct, and directed-toward-the-plaintiff elements of intentional infliction of emotional distress, and (3) the employee acting within the course and scope of employment elements of respondeat superior. The traditional summary judgment raised First Amendment grounds as a bar to Kelly's negligent selection, hiring, and retention claims and pastor or church malpractice (negligence) claims; COGIC also argued that Allen was not an employee of COGIC as a matter of law. The trial court granted both of COGIC's motions and rendered a take nothing judgment.

**No-Evidence Summary Judgment Standard of Review**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199

3

S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus., Inc.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

**Traditional Summary Judgment Standard of Review**

We review a summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c).

## Analysis

### Respondeat Superior[3]

In its traditional motion, COGIC argued that as a matter of law, Allen was not an employee of COGIC because it did not have the right to "control the progress, details, and methods of operations of" his work.

#### Applicable Law

Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an employee acting within the scope of his employment although the employer has not personally committed a wrong. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 910 (Tex. App.—Fort Worth 2009, pet. denied). The right of control is the "supreme test" for whether a master-servant relationship, rather than an independent contractor relationship, exists. *Wolff*, 94 S.W.3d at 542; *Farlow*, 284 S.W.3d at 911. An agent is considered an employee only if the principal has both (1) the right to assign the agent's tasks *and* (2) the right to control the means and details by which the agent will accomplish those tasks. *Heritage Housing Dev., Inc. v. Carr*, 199 S.W.3d 560, 565–66 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Hanna v. Vastar Res.*, 84 S.W.3d 372,

---

[3]Although we typically review a no-evidence summary judgment first when both a traditional and no-evidence summary judgment are granted, we will review one of the grounds of the traditional motion first because some of the same evidence presented by Kelly is pertinent to the no-evidence issues. *See Reynolds v. Murphy*, 188 S.W.3d 252, 258 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g), *cert. denied*, 549 U.S. 1281 (2007).

5

376 (Tex. App.—Beaumont 2002, no pet); *see Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002).

We measure the right to control by considering (1) the independent nature of the worker's business, (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job, (3) the worker's right to control the progress of the work except about final results, (4) the time for which the worker is employed, and (5) the method of payment, whether by unit of time or by the job. *Limestone Prods*., 71 S.W.3d at 312; *Farlow*, 284 S.W.3d at 911. Examples of the type of control normally exercised by an employer include when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of the work, the tools and appliances used to perform the work, and the physical method or manner of accomplishing the end result. *Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278–79 (Tex. 1990).

The right to control must relate to the conduct complained of. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007); *Farlow*, 284 S.W.3d at 912; *Williams v. United Pentecostal Church Int'l*, 115 S.W.3d 612, 618 (Tex. App.—Beaumont 2003, no pet.). Additionally, the right to terminate an agreement engaging the services of a worker is not evidence that details of the work are subject to the principal's control. *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 714 (Tex. App.—Fort Worth 2006, no pet.).

Whether a person is an employee is generally a question of law. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Farlow*, 284 S.W.3d at 913.

**COGIC's Evidence**

Here, COGIC presented summary judgment evidence that although Shiloh was at one time affiliated with COGIC, the proper paperwork was never completed; therefore, Shiloh had always been independent. Likewise, Allen was not ordained, nor was he selected as a prophet by COGIC. It is undisputed that Allen has continued to pastor Shiloh until the time of submission of this appeal.

COGIC also presented the testimony of Bishop Neaul Haynes[4] that although he appointed pastors to COGIC churches and the pastors were responsible for financial reporting to the bishops, he did not supervise the pastors, and they were on their own. The COGIC Official Manual, also attached to COGIC's motion for summary judgment, states that a pastor is responsible for the spiritual and doctrinal guidance of the local church, has a right to appoint or remove local church officers, and has the right to administer his office in accordance with COGIC's charter, bylaws, and constitution.

We conclude and hold that COGIC presented evidence that Allen was not an "employee" of COGIC as a matter of law. We therefore look to Kelly's

---

[4]Because many of the pastors and COGIC officials referred to in the evidence are often referred to by different titles, we will refer to those pastors and officials solely by their last names to prevent confusion.

7

responsive evidence to determine if she raised a fact issue sufficient to defeat COGIC's summary judgment motion.

**Kelly's Evidence**

Kelly's Sixth Amended Petition states that COGIC "allowed . . . Allen to be [p]astor of Shiloh, administer pastoral counseling to members of Shiloh, attend COGIC seminars and conferences as a speaker[,] and generally controlled the duties, position and whereabouts of . . . Allen." In her brief, Kelly states that "the physical and sexual abuse [she] endured occurred in the church or on church property during Allen's counseling. . . . Indeed the paddling was clearly 'connected with' and grew out of the 'counseling' administered by Allen as pastor of the church." Kelly asserts this shows that Allen used "COGIC's reputation, assets[,] and property" in commission of the alleged acts.

Kelly attached to her response to COGIC's motion a copy of COGIC's "Official Manual with the Doctrines and Discipline of the Church of God in Christ 1973." The manual provides that the General Assembly "has power to express doctrines and creeds of the Church, and its decisions shall be binding on all members of" COGIC. It also provides that a Jurisdictional Bishop of a Jurisdictional Assembly within the General Assembly shall appoint the pastor of a local church but that a local church may "establish its own constitution and by-laws, provided the same shall not be in conflict with or repugnant to the Charter, Constitution, Laws and Doctrines" of COGIC. Further, the manual states that a Jurisdictional Bishop has "general supervision over all departments and

8

Churches in his jurisdiction." The Elders Council of a Jurisdictional Assembly may suspend or remove a pastor found guilty of (1) failure to abide by COGIC's rules and regulations, (2) misfeasance, malfeasance, or nonfeasance in office, (3) being convicted of a felony or misdemeanor involving moral turpitude, (4) espousing doctrines repugnant to COGIC's articles of faith, (5) personal misconduct, (6) misappropriation or misuse of funds, or (7) conduct unbecoming to a minister.

Kelly also attached COGIC's Sexual Misconduct Policy, which provides that any allegations involving a local church or pastor be reported at the jurisdictional level. The policy prohibits "employees, agents[,] or representatives" of COGIC from engaging in sexual harassment or misconduct. It further makes local church pastors "responsible for the implementation and enforcement" of the policy and for "maintaining a working worship environment, free from sexual misconduct of any kind."

In 2007, COGIC either ordered Haynes to suspend Allen, or Haynes asked for COGIC's permission to suspend Allen after being advised by counsel of the results of a COGIC investigation into Kelly's complaint. Regardless, in June 2007, Haynes sent Allen a letter stating,

> Due to the allegations of sexual misconduct, the Presiding Bishop and General Board have been advised by the General Counsel of the Church of God in Christ, to authorize me to give the following ruling to you:
>
> I therefore advise you that this letter serves as official notification of suspension, with pay, of your pastoral duties and responsibilities at

9

the Shiloh Institutional Church of God in Christ, Fort Worth, Texas and as Vice-President of the National Evangelist Department. This suspension is effective immediately and will continue indefinitely pending the outcome of the civil investigation.

This edict is made under the authority of the General Board's Resolution to the General Assembly, voted on and approved in the November, 2002 session. It reads as follows:

> "*The Presiding Bishop and General Board will have the authority to suspend any officer, elected or appointed, including, but not limited to, Bishops, Supervisors, Pastors, Elders, Ministers, Missionaries, Evangelists or Deacons, pending the outcome of any allegations of misconduct which ha[ve] the potential to substantially impact the National Church financially, morally and spiritually. The Presiding Bishop, with the approval of the General Board, shall have authority to delegate this authority to the Jurisdictional Bishop where the misconduct occurred*."

Even though he purported to suspend Allen from his pastoral duties in the letter, Haynes stated in his deposition that he did not relieve Allen of his "duties at the pulpit" and told Allen he could continue preaching because Haynes did not have anyone else to preach at the church. However, Haynes explained that Allen was no longer able to participate in national business of the church and in his position as an assistant officer.[5]

When asked if Shiloh was still a part of COGIC in 2007, Haynes replied,

For all practical purposes, their participation in the church activities had been continued from the time that he asked and I said okay. He had been a member of the church, had been a member of the Fort Worth district under J.L. Johnson all that time. That's how he came

---

[5]At some point, Allen held a national position with COGIC as assistant to the evangelist department president.

10

about becoming an officer. So he was considered a member even though he had not been granted the certificate of membership.

When asked whether Shiloh and Allen were "under the authority of" COGIC from 1992 to 2007, Bishop Haynes answered, "Yes."

Kelly's evidence shows that Allen was the pastor for several years before Shiloh began "fellowshipping" with COGIC, which means that although Shiloh was allowed to use the name "Church of God in Christ" and Allen participated in ecclesiastical activities of COGIC, Shiloh never applied for nor was registered as a member church of COGIC.

Kelly attached a letter from Allen to COGIC, sent after Haynes's letter purporting to suspend Allen, stating that Shiloh was severing "ecclesiastical ties" with COGIC and taking COGIC out of Shiloh's name, pointing out that Shiloh was never issued a certificate of membership for COGIC, and noting that COGIC's name was not on any of Shiloh's property or bank accounts, nor was Shiloh ever incorporated as "Church of God in Christ." [6] Kelly presented no evidence that *COGIC* had any control or ownership interest over *Shiloh's* assets or property.

**Analysis**

Kelly asserts that COGIC's authority to "suspend" Allen from preaching at Shiloh shows the amount of control required for Allen to be considered an

---

[6] In contrast, COGIC's Doctrines and Discipline states, "A local church, which has been accepted by [COGIC] and issued a Certificate of Membership, shall not have the legal right or privilege to withdraw or sever its relations with the General Church, except by and with the permission of the General Assembly."

11

employee of COGIC for respondeat superior purposes, but the ability to terminate a worker is not the sole touchstone of "control." *Bell*, 205 S.W.3d at 713. COGIC's argument that Shiloh was merely "fellowshipping" with COGIC, and therefore was not a full member of COGIC, also fails to adequately address the issue at hand, which is whether COGIC controlled the details of Allen's work.

The evidence shows that COGIC did not hire Allen, did not own any assets connected with Shiloh, and although it purported to suspend Allen, that suspension merely extended to Allen's participation in COGIC activities. Allen's and Shiloh's severance from COGIC without any attendant consequences shows that COGIC really did not have the authority to meaningfully discipline, suspend, or terminate Allen with respect to his activities at Shiloh.

Moreover, even if COGIC exercised some control to which Allen acquiesced by virtue of the "fellowshipping" arrangement—for example, that he would abide by the sexual misconduct policy as pastor of Shiloh—there is still no evidence of an ability to control the details of how Allen went about his work as pastor, including preaching, overseeing the church, and counseling parishioners. Requiring a worker to comply with applicable laws, regulations, and safety requirements does not show a right of control over the details of how a worker performs his or her job. *See Farlow*, 284 S.W.3d at 915.

Accordingly, we conclude and hold that the evidence shows that COGIC did not have such a right of control over the details of Allen's work as pastor of Shiloh that it could be liable as an employer for purposes of respondeat

12

superior.[7]  *See, e.g., id.* at 915–17.  We overrule Kelly's second issue to the extent it complains about the traditional summary judgment on respondeat superior grounds.[8]

**No-Evidence Motion**

In its no-evidence motion, COGIC contends that Kelly produced no evidence of duty, breach, or proximate causation for the negligence claim and the negligent hiring, supervision, retention, and training claims.  Additionally, it contends there is no evidence that it acted recklessly or intentionally, that its conduct was extreme and outrageous, or that it directed extreme and outrageous conduct at Kelly, for purposes of her intentional infliction of emotional distress claim.

### Negligence

Kelly alleged in her Sixth Amended Petition that COGIC was negligent in the following ways:

(a)    in failing to provide a safe environment for members and attendees of Shiloh such as Davina Kelly;

(b)    in failing to protect Davina Kelly while she was under the supervision of [Allen and COGIC];

---

[7]Kelly did not plead or attempt to raise a fact issue on ostensible agency. *See, e.g., Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 949–50 (Tex. 1998); *Farlow*, 284 S.W.3d at 919–20.

[8]COGIC also moved for a no-evidence summary judgment on whether Allen was an employee of COGIC.  Kelly's evidence fails to raise a fact issue under that standard as well.

(c)     in failing to provide adequate and safe supervision of Davina Kelly while she was engaged in Shiloh sponsored activities;

(d)     in negligently hiring and/or approving its agents/employees/chaperones;

(e)     [in] negligently retaining its agents/employees/chaperones;

(f)     [in] negligently supervising its agents/employees/chaperones;

(g)     [in] failing to timely and properly implement and enforce policies to prevent the abuse of women;

(h)     in failing to provide adequate supervision and monitoring of Sherman Allen;

(i)     in failing to institute and implement policies for the protection of members attending Shiloh;

(j)     in failing to take steps, after learning of Sherman Allen's inappropriate behavior, to make sure that other people were not beaten and raped;

(k)     in failing to warn the congregation that complaints had been received about the inappropriate behavior; and

(l)     in covering up the allegations against Sherman Allen, and refusing to cooperate with investigations, thus increasing the chance that other people would be beaten and raped.

Kelly alleged that COGIC was liable vicariously for the acts of Allen, Haynes, Gerald Harris, Williams, a COGIC elder,[9] and "all members of the General Board at all times relevant to the allegations in [the] Petition and any other employees, officers, deacons, ministers[,] and directors who knew or should have known of Sherman Allen's behavior." She further alleged that

---

[9]COGIC appointed Harris and Williams to investigate Kelly's 2005 complaint to COGIC.

14

COGIC "had a legal duty to persons who attended . . . Shiloh to act in a reasonable manner to protect members participating in Shiloh activities and during their employment."

**Applicable Law**[10]

"The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability. . . . . Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798–99 (citations omitted). Causation must be proved, and conjecture, guess, or speculation will not suffice as that proof. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009).

**Kelly's Evidence**

According to Kelly, she presented evidence that COGIC owed her a duty because its agents knew of allegations that Allen had paddled at least two parishioners in 1990; thus, her injury was foreseeable. She also alleged that COGIC had superior knowledge than she did of Allen's past behavior and that COGIC brought Allen into contact with her by allowing him to remain in a position of trust as pastor of Shiloh when COGIC knew he "was peculiarly likely to

_____

[10]The parties agree that the question of whether a duty exists is controlled by *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287 (Tex. 1996). For purposes of our analysis, we will presume, without deciding, that COGIC owed Kelly a duty under the principles set forth in *Golden Spread*.

15

physically or sexually assault under circumstances which afforded [him] the opportunity and temptation for such acts." However, Kelly did not discuss causation in her summary judgment response, stating only that "[b]y failing to act and remaining a bystander to the horrors being committed by Allen, COGIC breached its duty to . . . Kelly. The evidence of damages speaks for itself."

Kelly presented deposition testimony from Carrie Lee Drake, who testified that she attended a meeting with her husband, her friend Rosina Robinson and Robinson's husband, and Ava Johnson and her husband. COGIC elder Battles, Haynes, and another pastor were present. According to Drake, Allen was not there. They discussed "the paddling [and] the questions that [were] asked that were inappropriate." She recalled specifically telling Haynes and Battles that Allen had paddled her with her clothes off. She also told them that Allen had asked her inappropriate questions, such as whether she was on the pill or sexually active. She also told them that if these things had happened to her, they would happen to someone else, and she did not want that to happen to anyone else. Robinson asked for Allen to be removed. Battles said he would look into the matter, and Haynes said, "[O]ld habits die hard." Drake said that Battles taped the meeting and gave the tape to Robinson.

Nelson Lee Drake, Drake's ex-husband, testified that after she told him about the paddling in 1989 or 1990, they "got a group together, because we found more victims, and we wanted something done about it." The group met

16

with Battles.[11]  Nelson confirmed that Drake and the other women told Battles about the paddling.  Nelson remembered that Robinson had a cast on her wrist because Allen had tried to paddle her and broke her wrist.  According to Nelson, the women did not complain about any behavior other than the paddling.  Battles said he would look into the matter, talk to Allen, and get back to the group.  Also, Battles was the one who called the police.  The group told the police the same thing they told Battles, but the police told them there was nothing they could do because it was a church matter.  The police did not file a report.

Kelly also attached Rosina Robinson McDonald's deposition testimony to her summary judgment response.  McDonald testified that she and her husband called Battles in 1990 to report what Allen did to her and to report what others at the church were saying.  According to McDonald, at the time, Battles was "superintendent of a certain area of churches in [COGIC] in Fort Worth."  When McDonald and her husband told Battles about the allegations, he said, "Sherman is like my son. . . . I know that this can't be true because he is like a son to me."  However, he agreed to talk to Allen and get back to them.

When Battles called McDonald back, he said Allen denied the allegations and that Haynes should be consulted.  McDonald testified that after that, she got letters from "everybody that had come forth" and took those letters to Battles.  Battles then asked if McDonald would come to a meeting with Haynes.  She

---

[11]Nelson could not remember meeting with Haynes.

17

agreed. The meeting attendants were McDonald and her husband, Haynes, Allen, Battles, J.L. Johnson, Liddell Thomas,[12] and two unidentified men. She confirmed that Battles taped the meeting.

Haynes let McDonald explain what Allen did to her, Drake, and another friend named ZZ. Haynes then told McDonald that Allen had explained to him that she was making up the allegations because she was angry Allen had "let [her] mother die." McDonald testified that she told Haynes,

> I already know that - - he openly said, Sherman Allen openly said that you guys scratch each others' back. I said, I know you're not going to do shit to him anyway. I said, so all I'm asking from you is to tell the other people in the church that this is something that God does not require of them in order to be saved or to be a part of the church. . . . [J]ust tell the people so the people will be informed that this is not anything that God requires to allow somebody to do this to them.
>
> And he said, well, Sister McDonald, we're going to try to help any way we can. And I said, you're not going to do anything because it's a habit for him. And he said, well, Sister McDonald, can't habits be broken? I said, you're right, Bishop, . . . [i]t's a lifestyle for him. I said, it will happen again. He said, we're going to make sure that Superintendent Johnson comes and is like - - the word he used was - - I think he used the words "supervising him," and that if anything goes on, you call me and you let me know.

McDonald testified to a second meeting at Shiloh with Haynes, Allen, Johnson, and West, another pastor. All the church members were at the meeting, which was not held on a Sunday. Haynes said they were there because of some problems in the church, but he did not say anything about the

---

[12]McDonald thought Johnson was a COGIC superintendent; Thomas was another pastor.

18

paddling. Instead, he said that even if a pastor has problems, no one has a right to destroy a church. He told the church members that Johnson would be "making sure that he's . . . supervising the services." Haynes also told the members that if anything else happened, "he [presumably Johnson] knows how to contact me."

Kelly also attached an affidavit from Allen stating that "[i]n 1990, Bishop Neaul Haynes assigned J.L. Johnson to monitor me at the Shiloh Church based on complaints made by female members of the Shiloh Church involving allegations that I had paddled them."

Haynes testified about his role as a bishop of COGIC. He stated that if he becomes aware of any conflict or rule-breaking, he appoints an investigative committee, selects the members of that committee, and guides the committee in conducting an authentic investigation. His role is defined by COGIC. Once a complaint is found to be true, the complaint is sent to the national elders' council for trial. The council is made up of all the elders in COGIC. A "court" is selected from among the members of the council. The court reviews the information compiled by the investigative committee and then makes a recommendation to the bishop as to what action should be taken regarding the complaint. In a past proceeding, Haynes had removed a pastor, or the pastor resigned, and the church remained in existence with a new pastor appointed by Haynes.

Haynes appointed Johnson as "overseer" of Allen, not because it was mandated by COGIC policy, but because

the way that it was brought to my attention, that was all I could do. I felt that I had to do something to see if this was going to - - the seriousness of it and if it was valid and what have you and him being an official of the church and what have you, I felt that would be a way to resolve this if it was - - needed to do so.

Haynes first recalled hearing about Allen from Battles who called in 1989 or 1990 and "suggested that probably to look into his activities would be meaningful and helpful." Battles was "emphatic" that Haynes should "check into what is happening" and suggested a meeting would be helpful. Haynes then heard other people mention "something happening" in conversation and decided to meet with Allen and some other pastors. Haynes denied hearing any rumors about Allen until after the conversation with Battles.

Haynes held the meeting suggested by Battles at Battles's church. Battles, Johnson, a man named R.L. Samples, Allen, two or three women whose names he could not remember and a husband of one of them,[13] and a now-deceased pastor were present. Haynes remembered the young woman there with her husband because "the things she said made me remember her." The women "talked about their personal relationships with . . . Allen," and Haynes "remember[ed] distinctly that neither of them who spoke, spoke in a derogatory way about . . . Allen." According to Haynes,

> one of the young ladies, the one whose husband was there, she said to . . . Allen, you know I told you I would always love you and I still will always love you, and her husband was sitting right there, and I'm

---

[13]Haynes later said another of the women's husbands may have been present.

20

dodging because I didn't know whether - - but it was very evident that they were present, but they were not adamant and hostile toward . . . Allen at all.

According to Haynes, he held the meeting because Allen was seeking to become a member of COGIC, and Haynes "needed to know if there was something seriously going on." Haynes could not remember if the women talked about paddling, but he said, "There might have been a mentioning of him doing something to them." However, Haynes testified that nothing was going on "except they were disgruntled about the relationship that was existing presently between them and . . . Allen." When asked whether he remembered the women mentioning paddling, Haynes said he did not and explained: "[I]n a situation where people are talking, if they were trying to damage him in any kind of permanent or appreciable way, it was not that obvious to me." Haynes admitted that he could not "do anything concrete" to Allen unless "he was guilty of doing something that the church did not approve of." Haynes said he only invited the pastors to the meeting and that one of the pastors must have invited the women.

After the meeting, Haynes

> assigned . . . Johnson to . . . attend the services of . . . Allen's church for six weeks. He was to go there on Sunday night, sit up on the rostrum, on the front where everybody could see him so everybody knew who he was, and if there was anything that anybody wanted to ask him or say to him, they would have an opportunity to do so, and he was also to determine if there was anything of an unusual nature, he was to report it back to me.

Haynes wanted Johnson to write down phone numbers or information reported to him. Haynes did not instruct Johnson to make an announcement because

21

everyone would have known who he was, and Allen would not have ignored a COGIC official at a church service. Johnson was not supposed to tell the congregation why he was there.

When Johnson reported to Haynes, he said that "he found nothing. Nobody reported anything to him, nobody complained of any improprieties or anything." Haynes did not take any further action because he did not get any complaints after that. The next time he heard about anything "fishy" having to do with Allen was in 2005 when Kelly sent a letter to COGIC detailing her allegations against Allen. After COGIC received Kelly's 2005 letter, Haynes did not appoint an investigative committee and did nothing concerning the allegations until he sent the letter to Allen purporting to suspend Allen from his duties at Shiloh and in COGIC. According to Haynes, it was not his place to do so because the complaint was initiated at the national level.

J.L. Johnson testified by deposition about the meeting. He said that he, Allen, Haynes, and Samples attended, but he could not remember whether Battles attended. He did not know if West was there; he knew some other COGIC representatives attended, but he could not remember their names. He likewise did not remember the names of the women who attended the meeting.

Johnson testified that the meeting took place at his church. Johnson remembered a discussion, but he could not remember discussing paddling specifically. He remembered Haynes asking him to "once or twice" supervise or look in on Allen and the congregation about the allegations in the meeting.

22

Johnson reported back to Haynes that he visited three or four times but that everything was fine.  No one talked to him while he was at Shiloh.  Johnson said he never made any announcements or gave any talks to the congregation.

Kelly also attached a May 15, 2007 letter from Allen to the General Board responding to a statement to the press indicating Allen had been suspended.  In the letter, Allen said that he had voluntarily stopped preaching at Shiloh in February 2007.[14]  He also referred to COGIC as "our church."  He stated he did not want to appear to defy an order of COGIC because he had taught Shiloh members to respect the structure of COGIC.

**Analysis**

Kelly contends that COGIC's failure to protect her from Allen, to provide her and other church members a safe environment, and to warn other church members or take appropriate steps in 1990 proximately caused her injuries as a result of Allen's behavior.  Thus, she contends that but for COGIC's failure to act in 1990, Allen would not have had the opportunity to injure her while she was being counseled by him and when she was working as an employee for him and for Shiloh.

Kelly has failed to bring forward a scintilla of evidence beyond mere conjecture, speculation, or guess showing that COGIC's failure to act in 1990

---

[14]The record does not show how long this self-imposed cessation lasted; however, the record is clear that Allen resumed his duties at some point after breaking ties with COGIC.

23

proximately caused her injuries. The same affiliation between COGIC and Shiloh existed in 1990 as in 2007 when Haynes attempted to suspend Allen; even if COGIC had attempted to suspend Allen after learning of the 1990 allegations, there is no evidence that its doing so would have prevented Allen and Shiloh from severing ties with COGIC and Allen continuing to preach at Shiloh without COGIC affiliation as he did in 2007. Kelly brought forward no evidence that if COGIC had told the congregation at Shiloh of the allegations against Allen in 1990 that Kelly would have heard of these allegations and not have begun or continued attending Shiloh. According to McDonald's and Drake's testimony, at least some of the parishioners were aware of their allegations that Allen had paddled young women in the church. Allen's letter attached as summary judgment evidence shows that even after the allegations became public and COGIC tried to suspend him, Shiloh, although in Chapter 11 bankruptcy, was still a functioning church and members were still attending. There is simply no evidence that even if COGIC representatives had made the congregation aware of the 1990 allegations at that time that Allen would not have remained as pastor of Shiloh and thus would not have been able to commit the alleged acts against Kelly.[15]

---

[15]Our analysis should not be construed to approve of COGIC's response to the 1990 allegations or to diminish the seriousness of Allen's alleged behavior. However, on the specific facts of this case, the link between COGIC's alleged lack of, or ineffectual, response in 1990 and the heinous acts alleged in 2001 through 2005 are too attenuated to amount to cause in fact under our negligence law.

24

Accordingly, we conclude and hold that the trial court did not err by granting a no-evidence summary judgment on Kelly's negligence claims.[16]

**Negligent Hiring, Supervision, Retention, and Training**

Kelly's Sixth Amended Petition included claims for negligent hiring, supervision, retention, and training. These types of claims are all simple negligence causes of action based on "an employer's direct negligence rather than on vicarious liability." *Morris v. JTM Materials, Inc*., 78 S.W.3d 28, 49 (Tex. App.—Fort Worth 2002, no pet.).

**Applicable Law**

Negligence in hiring or retention requires that an employer's failure to investigate, screen, or supervise its employees proximately caused the injuries the plaintiff alleges. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 796 (Tex.

---

[16]Because we conclude that there is no evidence of cause in fact, we do not address the parties' foreseeability arguments. We note that COGIC's argument—that the 1990 allegations of paddling "did not make it foreseeable that a grown, competent, 28 year old woman would *allow herself* to be paddled regularly for 4 years and to be repeatedly raped over a period of 4 months"— appears to attack Kelly's credibility and, as such, does not comport with the applicable standard of review. [Emphasis added.] Nothing in the facts alleged by Kelly, including any delay in a failure to report, compels the conclusion that her testimony lacked credibility; furthermore, the credibility of a witness is not a matter to be resolved by a no-evidence summary judgment. *See, e.g.*, *Wilcox v. Marriott*, 103 S.W.3d 469, 475 (Tex. App.—San Antonio 2003, pet. denied). Despite the offensiveness of this argument, which we presume was unintended but which nevertheless implies that a woman can be culpable for "allow[ing]" herself to be "repeatedly raped," we did not consider it in our analysis of this issue as it was not necessary for us to reach foreseeability. *See Cunningham v. Blue Cross Blue Shield of Tex.*, No. 02-06-00363-CV, 2008 WL 467399, at *2 (Tex. App.—Fort Worth Feb. 24, 2008, pet. denied) (mem. op.) (on reh'g).

2006); *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.). An employer is not negligent when there is nothing in the employee's background that would cause a reasonable employer not to hire or retain the employee. *Fifth Club*, 196 S.W.3d at 796; *Dangerfield*, 264 S.W.3d at 912. To establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so caused his injuries. *Dangerfield*, 264 S.W.3d at 912. To establish a claim for negligent supervision, a plaintiff must show that an employer's failure to supervise its employees caused his injuries. *Id*. at 913. Thus, to be liable for negligent hiring, supervision, retention, or training, a defendant must have been involved in hiring the actor or retaining that actor in its employ. *See Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996); *CoTemp, Inc. v. Houston W. Corp*., 222 S.W.3d 487, 492 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

**Analysis**

Because there is no evidence that COGIC participated in the hiring or retention of Allen as pastor of Shiloh—or that it retained the requisite control over Allen's day-to-day activities as pastor—a no-evidence summary judgment was proper as to Kelly's negligent hiring, supervision, retention, and training claims. *See Golden Spread*, 926 S.W.2d at 290; *Williams*, 115 S.W.3d at 618. Even to the extent Haynes assigned Johnson to "supervise" Allen in 1990, it is clear from the record that Allen acquiesced to those actions. Haynes testified that COGIC

26

had a sexual misconduct policy in place, which made local pastors responsible for its implementation at the local level; however, Haynes did not initiate the process in 1990 because no one filed a written complaint. There is no evidence indicating that Allen was unaware of the sexual misconduct policy or that additional training would have prevented Kelly's injuries. Finally, to the extent Kelly argues that COGIC should have investigated Allen's background before allowing Shiloh to use "Church of God in Christ" in its name, as we have stated before, there is no evidence that the fellowshipping or affiliation with COGIC is what drew Kelly to attend Shiloh.

### Intentional Infliction of Emotional Distress

COGIC further contends that Kelly did not present any evidence that it recklessly directed any conduct toward her or that its conduct was extreme or outrageous.

### Applicable Law

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Hoffmann-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998). Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

27

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Zeltwanger*, 144 S.W.3d at 445 (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Zeltwanger*, 144 S.W.3d at 445; *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999); Restatement (Second) of Torts § 46 cmt. d (1965). It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *Zeltwanger*, 144 S.W.3d at 445; *GTE Sw., Inc.*, 998 S.W.2d at 616; Restatement (Second) of Torts § 46 cmt. h. But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *Zeltwanger*, 144 S.W.3d at 445; *GTE Sw., Inc.*, 998 S.W.2d at 616; Restatement (Second) of Torts § 46 cmt. h.

Intentional infliction of emotional distress is, first and foremost, a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Zeltwanger*, 144 S.W.3d at 447. The tort's "clear purpose" is "to supplement existing forms of recovery by providing a cause of action for egregious conduct" that might otherwise go unremedied. *Id*. The tort should not be extended to "circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Id*.

28

**Analysis**

The extreme and outrageous behavior alleged by Kelly is that COGIC knew of the allegations made against Allen in 1990 and did nothing, thus facilitating Allen's being able to do even worse things to her. Thus, her complaint is that COGIC's behavior was extreme and outrageous because it failed to prevent her injury by either warning the parishioners or suspending or terminating Allen as pastor of Shiloh. In other words, she complains that COGIC failed to prevent Allen from intentionally inflicting emotional distress on her by not disclosing these incidents to the parishioners of Shiloh Church or terminating Allen.[17] COGIC's response to the 1990 allegations may have been so weak and ineffective as to be considered nonexistent, and possibly even calculated to discourage any further reporting, but it does not rise to the level of extreme and outrageous. *See id*. at 449. There is no evidence that COGIC knew of any matters related to Kelly specifically until she sent a letter to COGIC in 2005 detailing her allegations against Allen. Moreover, Kelly's complaint is at its core a negligence complaint; thus, the tort of intentional infliction of emotional distress is not available. *See id*. at 447. We conclude and hold that the trial court did not err by granting a no-evidence summary judgment on Kelly's intentional infliction of emotional distress claim.

---

[17]The evidence shows that the Kellys began attending Shiloh in either 1997 or 2000.

We overrule Kelly's first issue.[18]

## Conclusion

Having overruled the dispositive parts of Kelly's two issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  May 12, 2011

---

[18]Because we have concluded that the trial court properly granted either a traditional or no-evidence summary judgment on all of Kelly's claims, we need not address the contention in her second issue that the negligence claims are not barred on First Amendment grounds.  *See* Tex. R. App. P. 47.1.