02-10-047-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-10-00047-CV

 


 
 
 DAVINA KELLY
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 CHURCH OF GOD IN CHRIST, INC.
 
 
  
 
 
 APPELLEE
 
 


 

                                                                                                                             

------------

 

FROM THE 236TH
DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

          This is an appeal from a summary judgment
for the Church of God in Christ, Inc. (COGIC) in this suit arising from a
pastor’s alleged acts toward a parishioner.  In two issues, Davina Kelly, the
former parishioner, contends that the trial court erred by granting both no-evidence
and traditional summary judgments for COGIC.  We affirm.

Background Facts

          Kelly sued COGIC for (1)
negligence, (2) negligent hiring, supervision, retention, and training, (3) intentional
infliction of emotional distress, and (4) respondeat superior for the alleged
acts of Sherman Allen, pastor of Shiloh Institutional Church of God in Christ.[2] 
Kelly’s Sixth Amended Petition alleged that around 1990, a group of female
parishioners complained to a bishop of Texas Northeast Church of God in Christ,
Inc. that Allen had been paddling them “in various stages of undress” and that
COGIC took no action as a result of this complaint.  Kelly further alleged that
around 2001, Allen “engaged in a pattern of egregious physical and sexual abuse
against” her when she sought “spiritual counseling” from him.  According to
Kelly’s petition, these acts occurred both at the church and in the parsonage,
and Allen instituted them “under the guise of pastoral counseling.”

          Kelly said that she wrote a letter to COGIC
“specifically outlining this pattern of abuse” and that “COGIC pursuant to
[its] own policy and procedures appointed two Bishops to lead an investigation
into these allegations.”  However, Kelly contended that COGIC took no further action
until she filed suit, at which time COGIC purported to suspend Allen.

          COGIC filed both no-evidence and traditional
motions for summary judgment.  The no-evidence motion challenged Kelly’s lack
of evidence as to (1) duty, breach, and causation for the negligence
causes of action, (2) the intentional or reckless, extreme and outrageous
conduct, and directed-toward-the-plaintiff elements of intentional infliction
of emotional distress, and (3) the employee acting within the course and scope
of employment elements of respondeat superior.  The traditional summary
judgment raised First Amendment grounds as a bar to Kelly’s negligent
selection, hiring, and retention claims and pastor or church malpractice
(negligence) claims; COGIC also argued that Allen was not an employee of COGIC
as a matter of law.  The trial court granted both of COGIC’s motions and
rendered a take nothing judgment.

No-Evidence Summary Judgment Standard of Review

After an adequate time for discovery, the party
without the burden of proof may, without presenting evidence, move for summary
judgment on the ground that there is no evidence to support an essential
element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The
motion must specifically state the elements for which there is no evidence.  Id.;
Timpte Indus., Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial
court must grant the motion unless the nonmovant produces summary judgment
evidence that raises a genuine issue of material fact.  See Tex. R. Civ.
P. 166a(i) & cmt.; Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex.
2008).

When reviewing a no-evidence summary judgment, we
examine the entire record in the light most favorable to the nonmovant,
indulging every reasonable inference and resolving any doubts against the
motion.  Sudan v. Sudan,  199 S.W.3d 291, 292 (Tex. 2006).  We review a
no‑evidence summary judgment for evidence that would enable reasonable
and fair‑minded jurors to differ in their conclusions.  Hamilton,
249 S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).  We credit evidence favorable to the nonmovant if reasonable
jurors could, and we disregard evidence contrary to the nonmovant unless
reasonable jurors could not.  Timpte Indus., Inc., 286 S.W.3d at 310
(quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006)). 
If the nonmovant brings forward more than a scintilla of probative evidence
that raises a genuine issue of material fact, then a no-evidence summary
judgment is not proper.  Smith v. O=Donnell, 288
S.W.3d 417, 424 (Tex. 2009).

Traditional Summary Judgment Standard of Review

We review a summary judgment de novo.  Mann
Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848
(Tex. 2009).  We consider the evidence presented in the light most favorable to
the nonmovant, crediting evidence favorable to the nonmovant if reasonable
jurors could, and disregarding evidence contrary to the nonmovant unless
reasonable jurors could not.  Id.  We indulge every reasonable inference
and resolve any doubts in the nonmovant=s
favor.  20801, Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  A
defendant who conclusively negates at least one essential element of a cause of
action is entitled to summary judgment on that claim.  IHS Cedars Treatment
Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex.
2004); see Tex. R. Civ. P. 166a(b), (c).

Analysis

Respondeat
Superior[3]

          In its traditional motion, COGIC argued that
as a matter of law, Allen was not an employee of COGIC because it did not have
the right to “control the progress, details, and methods of operations of” his
work.

          Applicable Law

          Under the doctrine of
respondeat superior, an employer is vicariously liable for the negligence of an
employee acting within the scope of his employment although the employer has
not personally committed a wrong.  St. Joseph Hosp. v. Wolff, 94 S.W.3d
513, 541–42 (Tex. 2002); Farlow v. Harris Methodist Fort Worth Hosp., 284
S.W.3d 903, 910 (Tex. App.––Fort Worth 2009, pet. denied).  The right of
control is the “supreme test” for whether a master-servant relationship, rather
than an independent contractor relationship, exists.  Wolff, 94 S.W.3d
at 542; Farlow, 284 S.W.3d at 911.  An agent is considered an employee
only if the principal has both (1) the right to assign the agent’s tasks and
(2) the right to control the means and details by which the agent will
accomplish those tasks.  Heritage Housing Dev., Inc. v. Carr, 199 S.W.3d
560, 565–66 (Tex. App.—Houston [1st Dist.] 2006, no pet.); Hanna v. Vastar
Res., 84 S.W.3d 372, 376 (Tex. App.––Beaumont 2002, no pet); see
Limestone Prods. Distrib., Inc. v. McNamara, 71 S.W.3d 308, 312 (Tex. 2002).

We measure the right to control by considering (1) the
independent nature of the worker’s business, (2) the worker’s obligation to
furnish necessary tools, supplies, and materials to perform the job, (3) the
worker’s right to control the progress of the work except about final results, (4)
the time for which the worker is employed, and (5) the method of payment,
whether by unit of time or by the job.  Limestone Prods., 71 S.W.3d at
312; Farlow, 284 S.W.3d at 911.  Examples of the type of control
normally exercised by an employer include when and where to begin and stop
work, the regularity of hours, the amount of time spent on particular aspects
of the work, the tools and appliances used to perform the work, and the
physical method or manner of accomplishing the end result.  Thompson v.
Travelers Indem. Co. of R.I., 789 S.W.2d 277, 278–79 (Tex. 1990).

The right to control must relate to the conduct
complained of.  See Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d 754,
757 (Tex. 2007); Farlow, 284 S.W.3d at 912; Williams v. United
Pentecostal Church Int’l, 115 S.W.3d 612, 618 (Tex. App.––Beaumont 2003, no
pet.).  Additionally, the right to terminate an agreement engaging the services
of a worker is not evidence that details of the work are subject to the
principal’s control.  Bell v. VPSI, Inc., 205 S.W.3d 706, 714 (Tex.
App.––Fort Worth 2006, no pet.).

Whether a person is an employee is generally a
question of law.  Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606 (Tex. 2002);
Farlow, 284 S.W.3d at 913.

COGIC’s Evidence

          Here, COGIC presented summary judgment
evidence that although Shiloh was at one time affiliated with COGIC, the proper
paperwork was never completed; therefore, Shiloh had always been independent. 
Likewise, Allen was not ordained, nor was he selected as a prophet by COGIC.  It
is undisputed that Allen has continued to pastor Shiloh until the time of
submission of this appeal.

COGIC also presented the testimony of Bishop Neaul
Haynes[4]
that although he appointed pastors to COGIC churches and the pastors were
responsible for financial reporting to the bishops, he did not supervise the
pastors, and they were on their own.  The COGIC Official Manual, also attached
to COGIC’s motion for summary judgment, states that a pastor is responsible for
the spiritual and doctrinal guidance of the local church, has a right to
appoint or remove local church officers, and has the right to administer his
office in accordance with COGIC’s charter, bylaws, and constitution.

We conclude and hold that COGIC presented evidence
that Allen was not an “employee” of COGIC as a matter of law.  We therefore
look to Kelly’s responsive evidence to determine if she raised a fact issue
sufficient to defeat COGIC’s summary judgment motion.

          Kelly’s Evidence

          Kelly’s Sixth Amended Petition
states that COGIC “allowed . . . Allen to be [p]astor of Shiloh, administer
pastoral counseling to members of Shiloh, attend COGIC seminars and conferences
as a speaker[,] and generally controlled the duties, position and whereabouts
of . . . Allen.”  In her brief, Kelly states that “the physical and sexual
abuse [she] endured occurred in the church or on church property during Allen’s
counseling. . . .  Indeed the paddling was clearly ‘connected with’ and grew
out of the ‘counseling’ administered by Allen as pastor of the church.”  Kelly
asserts this shows that Allen used “COGIC’s reputation, assets[,] and property”
in commission of the alleged acts.

          Kelly attached to her response to COGIC’s
motion a copy of COGIC’s “Official Manual with the Doctrines and Discipline of
the Church of God in Christ 1973.”  The manual provides that the General Assembly
“has power to express doctrines and creeds of the Church, and its decisions
shall be binding on all members of” COGIC.  It also provides that a
Jurisdictional Bishop of a Jurisdictional Assembly within the General Assembly shall
appoint the pastor of a local church but that a local church may “establish its
own constitution and by-laws, provided the same shall not be in conflict with
or repugnant to the Charter, Constitution, Laws and Doctrines” of COGIC. 
Further, the manual states that a Jurisdictional Bishop has “general
supervision over all departments and Churches in his jurisdiction.”  The Elders
Council of a Jurisdictional Assembly may suspend or remove a pastor found
guilty of (1) failure to abide by COGIC’s rules and regulations, (2) misfeasance,
malfeasance, or nonfeasance in office, (3) being convicted of a felony or
misdemeanor involving moral turpitude, (4) espousing doctrines repugnant to
COGIC’s articles of faith, (5) personal misconduct, (6) misappropriation or
misuse of funds, or (7) conduct unbecoming to a minister.

          Kelly also attached COGIC’s Sexual
Misconduct Policy, which provides that any allegations involving a local church
or pastor be reported at the jurisdictional level.  The policy prohibits
“employees, agents[,] or representatives” of COGIC from engaging in sexual
harassment or misconduct.  It further makes local church pastors “responsible
for the implementation and enforcement” of the policy and for “maintaining a
working worship environment, free from sexual misconduct of any kind.”

          In 2007, COGIC either ordered Haynes to
suspend Allen, or Haynes asked for COGIC’s permission to suspend Allen after
being advised by counsel of the results of a COGIC investigation into Kelly’s
complaint.  Regardless, in June 2007, Haynes sent Allen a letter stating,

Due to the
allegations of sexual misconduct, the Presiding Bishop and General Board have
been advised by the General Counsel of the Church of God in Christ, to
authorize me to give the following ruling to you:

 

I therefore advise you
that this letter serves as official notification of suspension, with pay, of
your pastoral duties and responsibilities at the Shiloh Institutional Church of
God in Christ, Fort Worth, Texas and as Vice-President of the National
Evangelist Department.  This suspension is effective immediately and will
continue indefinitely pending the outcome of the civil investigation.

 

This edict is made
under the authority of the General Board’s Resolution to the General Assembly,
voted on and approved in the November, 2002 session.  It reads as follows:

 

“The Presiding
Bishop and General Board will have the authority to suspend any officer,
elected or appointed, including, but not limited to, Bishops, Supervisors,
Pastors, Elders, Ministers, Missionaries, Evangelists or Deacons, pending the
outcome of any allegations of misconduct which ha[ve] the potential to
substantially impact the National Church financially, morally and spiritually. 
The Presiding Bishop, with the approval of the General Board, shall have authority
to delegate this authority to the Jurisdictional Bishop where the misconduct
occurred.”

 

Even though he purported to suspend Allen from his
pastoral duties in the letter, Haynes stated in his deposition that he did not
relieve Allen of his “duties at the pulpit” and told Allen he could continue
preaching because Haynes did not have anyone else to preach at the church. 
However, Haynes explained that Allen was no longer able to participate in
national business of the church and in his position as an assistant officer.[5]

When asked if Shiloh was still a part of COGIC in
2007, Haynes replied,

For all practical
purposes, their participation in the church activities had been continued from
the time that he asked and I said okay.  He had been a member of the church,
had been a member of the Fort Worth district under J.L. Johnson all that time. 
That’s how he came about becoming an officer.  So he was considered a member
even though he had not been granted the certificate of membership.

 

When asked whether Shiloh and Allen were “under the
authority of” COGIC from 1992 to 2007, Bishop Haynes answered, “Yes.”

          Kelly’s evidence shows that Allen was the pastor
for several years before Shiloh began “fellowshipping” with COGIC, which means
that although Shiloh was allowed to use the name “Church of God in Christ” and
Allen participated in ecclesiastical activities of COGIC, Shiloh never applied
for nor was registered as a member church of COGIC.

Kelly attached a letter from Allen to COGIC, sent
after Haynes’s letter purporting to suspend Allen, stating that Shiloh was
severing “ecclesiastical ties” with COGIC and taking COGIC out of Shiloh’s name,
pointing out that Shiloh was never issued a certificate of membership for
COGIC, and noting that COGIC’s name was not on any of Shiloh’s property or bank
accounts, nor was Shiloh ever incorporated as “Church of God in Christ.” [6] 
Kelly presented no evidence that COGIC had any control or ownership
interest over Shiloh’s assets or property.

Analysis

          Kelly asserts that COGIC’s authority to
“suspend” Allen from preaching at Shiloh shows the amount of control required
for Allen to be considered an employee of COGIC for respondeat superior
purposes, but the ability to terminate a worker is not the sole touchstone of
“control.”  Bell, 205 S.W.3d at 713.  COGIC’s argument that Shiloh was
merely “fellowshipping” with COGIC, and therefore was not a full member of
COGIC, also fails to adequately address the issue at hand, which is whether
COGIC controlled the details of Allen’s work.

          The evidence shows that COGIC did not hire
Allen, did not own any assets connected with Shiloh, and although it purported
to suspend Allen, that suspension merely extended to Allen’s participation in
COGIC activities.  Allen’s and Shiloh’s severance from COGIC without any
attendant consequences shows that COGIC really did not have the authority to
meaningfully discipline, suspend, or terminate Allen with respect to his
activities at Shiloh.

Moreover, even if COGIC exercised some control to
which Allen acquiesced by virtue of the “fellowshipping” arrangement––for
example, that he would abide by the sexual misconduct policy as pastor of
Shiloh––there is still no evidence of an ability to control the details of how
Allen went about his work as pastor, including preaching, overseeing the
church, and counseling parishioners.  Requiring a worker to comply with
applicable laws, regulations, and safety requirements does not show a right of
control over the details of how a worker performs his or her job.  See
Farlow, 284 S.W.3d at 915.

Accordingly, we conclude and hold that the evidence
shows that COGIC did not have such a right of control over the details of
Allen’s work as pastor of Shiloh that it could be liable as an employer for
purposes of respondeat superior.[7] 
See, e.g., id. at 915–17.  We overrule Kelly’s second issue to the
extent it complains about the traditional summary judgment on respondeat
superior grounds.[8]

No-Evidence Motion

          In its no-evidence motion, COGIC contends
that Kelly produced no evidence of duty, breach, or proximate causation for the
negligence claim and the negligent hiring, supervision, retention, and training
claims.  Additionally, it contends there is no evidence that it acted
recklessly or intentionally, that its conduct was extreme and outrageous, or
that it directed extreme and outrageous conduct at Kelly, for purposes of her
intentional infliction of emotional distress claim.

Negligence

          Kelly alleged in her Sixth Amended Petition
that COGIC was negligent in the following ways:

(a)        
in failing to provide a safe environment for members and attendees of
Shiloh such as Davina Kelly;

 

(b)        
in failing to protect Davina Kelly while she was under the supervision
of [Allen and COGIC];

 

(c)        
in failing to provide adequate and safe supervision of Davina Kelly
while she was engaged in Shiloh sponsored activities;

 

(d)        
in negligently hiring and/or approving its agents/employees/chaperones;

 

(e)        
[in] negligently retaining its agents/employees/chaperones;

 

(f)          
[in] negligently supervising its agents/employees/chaperones;

 

(g)        
[in] failing to timely and properly implement and enforce policies to
prevent the abuse of women;

 

(h)        
in failing to provide adequate supervision and monitoring of Sherman
Allen;

 

(i)          
in failing to institute and implement policies for the protection of
members attending Shiloh;

 

(j)          
in failing to take steps, after learning of Sherman Allen’s
inappropriate behavior, to make sure that other people were not beaten and
raped;

 

(k)        
in failing to warn the congregation that complaints had been received
about the inappropriate behavior; and

 

(l)          
in covering up the allegations against Sherman Allen, and refusing to
cooperate with investigations, thus increasing the chance that other people
would be beaten and raped.

 

          Kelly alleged that COGIC was liable
vicariously for the acts of Allen, Haynes, Gerald Harris, Williams, a COGIC
elder,[9]
and “all members of the General Board at all times relevant to the allegations
in [the] Petition and any other employees, officers, deacons, ministers[,] and
directors who knew or should have known of Sherman Allen’s behavior.”  She
further alleged that COGIC “had a legal duty to persons who attended . . .
Shiloh to act in a reasonable manner to protect members participating in Shiloh
activities and during their employment.”

                   Applicable Law[10]

          “The two elements of proximate cause are
cause in fact (or substantial factor) and foreseeability. . . . .  Cause in
fact is established when the act or omission was a substantial factor in
bringing about the injuries, and without it, the harm would not have occurred.” 
IHS Cedars Treatment Ctr., 143 S.W.3d at 798–99 (citations omitted).  Causation
must be proved, and conjecture, guess, or speculation will not suffice as that
proof.  Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat’l Dev. &
Research Corp., 299 S.W.3d 106, 122 (Tex. 2009).

                    Kelly’s Evidence

According to Kelly, she
presented evidence that COGIC owed her a duty because its agents knew of
allegations that Allen had paddled at least two parishioners in 1990; thus, her
injury was foreseeable.  She also alleged that COGIC had superior knowledge
than she did of Allen’s past behavior and that COGIC brought Allen into contact
with her by allowing him to remain in a position of trust as pastor of Shiloh
when COGIC knew he “was peculiarly likely to physically or sexually assault
under circumstances which afforded [him] the opportunity and temptation for
such acts.”  However, Kelly did not discuss causation in her summary judgment
response, stating only that “[b]y failing to act and remaining a bystander to
the horrors being committed by Allen, COGIC breached its duty to . . . Kelly. 
The evidence of damages speaks for itself.”

Kelly presented deposition testimony from Carrie Lee
Drake, who testified that she attended a meeting with her husband, her friend
Rosina Robinson and Robinson’s husband, and Ava Johnson and her husband.  COGIC
elder Battles, Haynes, and another pastor were present.  According to Drake,
Allen was not there.  They discussed “the paddling [and] the questions that
[were] asked that were inappropriate.”  She recalled specifically telling
Haynes and Battles that Allen had paddled her with her clothes off.  She also
told them that Allen had asked her inappropriate questions, such as whether she
was on the pill or sexually active.  She also told them that if these things
had happened to her, they would happen to someone else, and she did not want
that to happen to anyone else.  Robinson asked for Allen to be removed. 
Battles said he would look into the matter, and Haynes said, “[O]ld habits die
hard.”  Drake said that Battles taped the meeting and gave the tape to
Robinson.

Nelson Lee Drake, Drake’s ex-husband, testified that
after she told him about the paddling in 1989 or 1990, they “got a group
together, because we found more victims, and we wanted something done about
it.”  The group met with Battles.[11]
 Nelson confirmed that Drake and the other women told Battles about the
paddling.  Nelson remembered that Robinson had a cast on her wrist because
Allen had tried to paddle her and broke her wrist.  According to Nelson, the
women did not complain about any behavior other than the paddling.  Battles
said he would look into the matter, talk to Allen, and get back to the group. 
Also, Battles was the one who called the police.  The group told the police the
same thing they told Battles, but the police told them there was nothing they
could do because it was a church matter.  The police did not file a report.

Kelly also attached Rosina Robinson McDonald’s
deposition testimony to her summary judgment response.  McDonald testified that
she and her husband called Battles in 1990 to report what Allen did to her and
to report what others at the church were saying.  According to McDonald, at the
time, Battles was “superintendent of a certain area of churches in [COGIC] in
Fort Worth.”  When McDonald and her husband told Battles about the allegations,
he said, “Sherman is like my son. . . . I know that this can’t be true because
he is like a son to me.”  However, he agreed to talk to Allen and get back to
them.

When Battles called McDonald back, he said Allen
denied the allegations and that Haynes should be consulted.  McDonald testified
that after that, she got letters from “everybody that had come forth” and took
those letters to Battles.  Battles then asked if McDonald would come to a
meeting with Haynes.  She agreed.  The meeting attendants were McDonald and her
husband, Haynes, Allen, Battles, J.L. Johnson, Liddell Thomas,[12]
and two unidentified men.  She confirmed that Battles taped the meeting.

Haynes let McDonald explain what Allen did to her, Drake,
and another friend named ZZ.  Haynes then told McDonald that Allen had
explained to him that she was making up the allegations because she was angry
Allen had “let [her] mother die.”  McDonald testified that she told Haynes,

I
already know that - - he openly said, Sherman Allen openly said that you guys
scratch each others’ back.  I said, I know you’re not going to do shit to him
anyway.  I said, so all I’m asking from you is to tell the other people in the
church that this is something that God does not require of them in order to be
saved or to be a part of the church. . . . [J]ust tell the people so the people
will be informed that this is not anything that God requires to allow somebody
to do this to them.

 

And
he said, well, Sister McDonald, we’re going to try to help any way we can.  And
I said, you’re not going to do anything because it’s a habit for him.  And he
said, well, Sister McDonald, can’t habits be broken?  I said, you’re right,
Bishop, . . . [i]t’s a lifestyle for him.  I said, it will happen again.  He
said, we’re going to make sure that Superintendent Johnson comes and is like -
- the word he used was - - I think he used the words “supervising him,” and
that if anything goes on, you call me and you let me know.

 

McDonald testified to a second meeting at Shiloh with
Haynes, Allen, Johnson, and West, another pastor.  All the church members were
at the meeting, which was not held on a Sunday.  Haynes said they were there
because of some problems in the church, but he did not say anything about the
paddling.  Instead, he said that even if a pastor has problems, no one has a
right to destroy a church.  He told the church members that Johnson would be
“making sure that he’s . . . supervising the services.”  Haynes also told the
members that if anything else happened, “he [presumably Johnson] knows how to
contact me.”

Kelly also attached an affidavit from Allen stating
that “[i]n 1990, Bishop Neaul Haynes assigned J.L. Johnson to monitor me at the
Shiloh Church based on complaints made by female members of the Shiloh Church
involving allegations that I had paddled them.”

Haynes testified about his role as a bishop of COGIC. 
He stated that if he becomes aware of any conflict or rule-breaking, he
appoints an investigative committee, selects the members of that committee, and
guides the committee in conducting an authentic investigation.  His role is
defined by COGIC.  Once a complaint is found to be true, the complaint is sent
to the national elders’ council for trial.  The council is made up of all the
elders in COGIC.  A “court” is selected from among the members of the council. 
The court reviews the information compiled by the investigative committee and
then makes a recommendation to the bishop as to what action should be taken
regarding the complaint.  In a past proceeding, Haynes had removed a pastor, or
the pastor resigned, and the church remained in existence with a new pastor
appointed by Haynes.

Haynes appointed Johnson as “overseer” of Allen, not
because it was mandated by COGIC policy, but because

the way that it was
brought to my attention, that was all I could do.  I felt that I had to do
something to see if this was going to  - - the seriousness of it and if it was
valid and what have you and him being an official of the church and what have
you, I felt that would be a way to resolve this if it was - - needed to do so.

 

Haynes first recalled hearing about Allen from Battles
who called in 1989 or 1990 and “suggested that probably to look into his
activities would be meaningful and helpful.”  Battles was “emphatic” that
Haynes should “check into what is happening” and suggested a meeting would be
helpful.  Haynes then heard other people mention “something happening” in
conversation and decided to meet with Allen and some other pastors.  Haynes
denied hearing any rumors about Allen until after the conversation with
Battles.

Haynes held the meeting suggested by Battles at
Battles’s church.  Battles, Johnson, a man named R.L. Samples, Allen, two or
three women whose names he could not remember and a husband of one of them,[13]
and a now-deceased pastor were present.  Haynes remembered the young woman
there with her husband because “the things she said made me remember her.”  The
women “talked about their personal relationships with . . . Allen,” and Haynes
“remember[ed] distinctly that neither of them who spoke, spoke in a derogatory
way about . . . Allen.”  According to Haynes,

one of the young
ladies, the one whose husband was there, she said to . . . Allen, you know I
told you I would always love you and I still will always love you, and her
husband was sitting right there, and I’m dodging because I didn’t know whether
- - but it was very evident that they were present, but they were not adamant
and hostile toward . . . Allen at all.

 

          According to Haynes, he held the meeting
because Allen was seeking to become a member of COGIC, and Haynes “needed to
know if there was something seriously going on.”  Haynes could not remember if
the women talked about paddling, but he said, “There might have been a
mentioning of him doing something to them.”  However, Haynes testified that
nothing was going on “except they were disgruntled about the relationship that
was existing presently between them and . . . Allen.”  When asked whether he remembered
the women mentioning paddling, Haynes said he did not and explained:  “[I]n a
situation where people are talking, if they were trying to damage him in any
kind of permanent or appreciable way, it was not that obvious to me.”  Haynes
admitted that he could not “do anything concrete” to Allen unless “he was
guilty of doing something that the church did not approve of.”  Haynes said he
only invited the pastors to the meeting and that one of the pastors must have
invited the women.

          After the meeting, Haynes

assigned . . .
Johnson to . . . attend the services of . . . Allen’s church for six weeks.  He
was to go there on Sunday night, sit up on the rostrum, on the front where
everybody could see him so everybody knew who he was, and if there was anything
that anybody wanted to ask him or say to him, they would have an opportunity to
do so, and he was also to determine if there was anything of an unusual nature,
he was to report it back to me.

 

Haynes wanted Johnson to write down phone numbers or
information reported to him.  Haynes did not instruct Johnson to make an
announcement because everyone would have known who he was, and Allen would not
have ignored a COGIC official at a church service.  Johnson was not supposed to
tell the congregation why he was there.

          When Johnson reported to Haynes, he said
that “he found nothing.  Nobody reported anything to him, nobody complained of
any improprieties or anything.”  Haynes did not take any further action because
he did not get any complaints after that.  The next time he heard about
anything “fishy” having to do with Allen was in 2005 when Kelly sent a letter
to COGIC detailing her allegations against Allen.  After COGIC received Kelly’s
2005 letter, Haynes did not appoint an investigative committee and did nothing
concerning the allegations until he sent the letter to Allen purporting to
suspend Allen from his duties at Shiloh and in COGIC.  According to Haynes, it
was not his place to do so because the complaint was initiated at the national
level.

          J.L. Johnson testified by deposition about
the meeting.  He said that he, Allen, Haynes, and Samples attended, but he
could not remember whether Battles attended.  He did not know if West was
there; he knew some other COGIC representatives attended, but he could not
remember their names.  He likewise did not remember the names of the women who
attended the meeting.

Johnson testified that the meeting took place at his
church.  Johnson remembered a discussion, but he could not remember discussing
paddling specifically.  He remembered Haynes asking him to “once or twice”
supervise or look in on Allen and the congregation about the allegations in the
meeting. Johnson reported back to Haynes that he visited three or four times but
that everything was fine.  No one talked to him while he was at Shiloh. 
Johnson said he never made any announcements or gave any talks to the
congregation.

Kelly also attached a May 15, 2007 letter from Allen
to the General Board responding to a statement to the press indicating Allen
had been suspended.  In the letter, Allen said that he had voluntarily stopped
preaching at Shiloh in February 2007.[14] 
He also referred to COGIC as “our church.”  He stated he did not want to appear
to defy an order of COGIC because he had taught Shiloh members to respect the
structure of COGIC.

          Analysis

Kelly contends that COGIC’s failure to protect her
from Allen, to provide her and other church members a safe environment, and to
warn other church members or take appropriate steps in 1990 proximately caused
her injuries as a result of Allen’s behavior.  Thus, she contends that but for
COGIC’s failure to act in 1990, Allen would not have had the opportunity to
injure her while she was being counseled by him and when she was working as an
employee for him and for Shiloh.

Kelly has failed to bring forward a scintilla of
evidence beyond mere conjecture, speculation, or guess showing that COGIC’s
failure to act in 1990 proximately caused her injuries.  The same affiliation
between COGIC and Shiloh existed in 1990 as in 2007 when Haynes attempted to
suspend Allen; even if COGIC had attempted to suspend Allen after learning of
the 1990 allegations, there is no evidence that its doing so would have
prevented Allen and Shiloh from severing ties with COGIC and Allen continuing to
preach at Shiloh without COGIC affiliation as he did in 2007.  Kelly brought
forward no evidence that if COGIC had told the congregation at Shiloh of the
allegations against Allen in 1990 that Kelly would have heard of these
allegations and not have begun or continued attending Shiloh.  According to
McDonald’s and Drake’s testimony, at least some of the parishioners were aware
of their allegations that Allen had paddled young women in the church.  Allen’s
letter attached as summary judgment evidence shows that even after the
allegations became public and COGIC tried to suspend him, Shiloh, although in
Chapter 11 bankruptcy, was still a functioning church and members were still
attending.  There is simply no evidence that even if COGIC representatives had made
the congregation aware of the 1990 allegations at that time that Allen would
not have remained as pastor of Shiloh and thus would not have been able to
commit the alleged acts against Kelly.[15]

Accordingly, we conclude and hold that the trial court
did not err by granting a no-evidence summary judgment on Kelly’s negligence
claims.[16]

          Negligent Hiring, Supervision, Retention,
and Training

          Kelly’s Sixth Amended Petition included
claims for negligent hiring, supervision, retention, and training.  These types
of claims are all simple negligence causes of action based on “an employer’s
direct negligence rather than on vicarious liability.”  Morris v. JTM
Materials, Inc., 78 S.W.3d 28, 49 (Tex. App.––Fort Worth 2002, no pet.).

                   Applicable Law

Negligence in hiring or retention requires that an employer’s
failure to investigate, screen, or supervise its employees proximately caused
the injuries the plaintiff alleges.  Fifth Club, Inc. v. Ramirez, 196
S.W.3d 788, 796 (Tex. 2006); Dangerfield v. Ormsby, 264 S.W.3d 904, 912
(Tex. App.––Fort Worth 2008, no pet.).  An employer is not negligent when there
is nothing in the employee’s background that would cause a reasonable employer
not to hire or retain the employee.  Fifth Club, 196 S.W.3d at 796; Dangerfield,
264 S.W.3d at 912.  To establish a claim for negligent training, a plaintiff
must prove that a reasonably prudent employer would have provided training
beyond that which was given and that failure to do so caused his injuries.  Dangerfield,
264 S.W.3d at 912.  To establish a claim for negligent supervision, a plaintiff
must show that an employer’s failure to supervise its employees caused his
injuries.  Id. at 913.  Thus, to be liable for negligent hiring,
supervision, retention, or training, a defendant must have been involved in
hiring the actor or retaining that actor in its employ.  See Golden Spread
Council, Inc. No. 562 of Boy Scouts of Am. v. Akins, 926 S.W.2d 287, 290
(Tex. 1996); CoTemp, Inc. v. Houston W. Corp., 222 S.W.3d 487, 492 (Tex.
App.––Houston [14th Dist.] 2007, no pet.).

Analysis

Because there is no evidence that COGIC participated
in the hiring or retention of Allen as pastor of Shiloh––or that it retained
the requisite control over Allen’s day-to-day activities as pastor––a no-evidence
summary judgment was proper as to Kelly’s negligent hiring, supervision,
retention, and training claims.  See Golden Spread, 926 S.W.2d at 290; Williams,
115 S.W.3d at 618.  Even to the extent Haynes assigned Johnson to “supervise”
Allen in 1990, it is clear from the record that Allen acquiesced to those
actions.  Haynes testified that COGIC had a sexual misconduct policy in place,
which made local pastors responsible for its implementation at the local level;
however, Haynes did not initiate the process in 1990 because no one filed a
written complaint.  There is no evidence indicating that Allen was unaware of
the sexual misconduct policy or that additional training would have prevented
Kelly’s injuries.  Finally, to the extent Kelly argues that COGIC should have investigated
Allen’s background before allowing Shiloh to use “Church of God in Christ” in
its name, as we have stated before, there is no evidence that the
fellowshipping or affiliation with COGIC is what drew Kelly to attend Shiloh.

Intentional Infliction of Emotional Distress

          COGIC further contends that Kelly did not
present any evidence that it recklessly directed any conduct toward her or that
its conduct was extreme or outrageous.

          Applicable Law

To recover damages for intentional infliction of
emotional distress, a plaintiff must establish that (1) the defendant acted
intentionally or recklessly, (2) the
defendant’s conduct was extreme and outrageous, (3) the defendant’s actions
caused the plaintiff emotional distress, and (4) the resulting emotional distress
was severe.  Hoffmann-LaRoche Inc. v. Zeltwanger, 144 S.W.3d 438, 445
(Tex. 2004); Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d
62, 65 (Tex. 1998).  Extreme and outrageous conduct is conduct “so outrageous
in character, and so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable in a
civilized community.”  Zeltwanger, 144 S.W.3d at 445 (quoting Twyman
v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993)).  Liability does not extend to
mere insults, indignities, threats, annoyances, petty oppressions, or other
trivialities.  Zeltwanger, 144 S.W.3d at 445; GTE Sw., Inc. v. Bruce,
998 S.W.2d 605, 612 (Tex. 1999); Restatement (Second) of Torts § 46 cmt. d
(1965).  It is for the court to determine, in the first instance, whether a
defendant’s conduct was extreme and outrageous.  Zeltwanger, 144 S.W.3d
at 445; GTE Sw., Inc., 998 S.W.2d at 616; Restatement (Second) of Torts
§ 46 cmt. h. But when reasonable minds may differ, it is for the jury, subject
to the court’s control, to determine whether, in the particular case, the
conduct was sufficiently extreme and outrageous to result in liability.  Zeltwanger,
144 S.W.3d at 445; GTE Sw., Inc., 998 S.W.2d at 616; Restatement (Second)
of Torts § 46 cmt. h.

Intentional infliction of emotional distress is, first
and foremost, a “gap-filler” tort, judicially created for the limited purpose
of allowing recovery in those rare instances in which a defendant intentionally
inflicts severe emotional distress in a manner so unusual that the victim has
no other recognized theory of redress.  Zeltwanger, 144 S.W.3d at 447.  The
tort’s “clear purpose” is “to supplement existing forms of recovery by
providing a cause of action for egregious conduct” that might otherwise go
unremedied.  Id.  The tort should not be extended to “circumvent the
limitations placed on the recovery of mental anguish damages under more
established tort doctrines.”  Id.

Analysis

The extreme and outrageous behavior alleged by Kelly
is that COGIC knew of the allegations made against Allen in 1990 and did
nothing, thus facilitating Allen’s being able to do even worse things to her. 
Thus, her complaint is that COGIC’s behavior was extreme and outrageous because
it failed to prevent her injury by either warning the parishioners or
suspending or terminating Allen as pastor of Shiloh.  In other words, she
complains that COGIC failed to prevent Allen from intentionally inflicting
emotional distress on her by not disclosing these incidents to the parishioners
of Shiloh Church or terminating Allen.[17] 
COGIC’s response to the 1990 allegations may have been so weak and ineffective
as to be considered nonexistent, and possibly even calculated to discourage any
further reporting, but it does not rise to the level of extreme and
outrageous.  See id. at 449.  There is no evidence that COGIC knew of
any matters related to Kelly specifically until she sent a letter to COGIC in
2005 detailing her allegations against Allen.  Moreover, Kelly’s complaint is
at its core a negligence complaint; thus, the tort of intentional infliction of
emotional distress is not available.  See id. at 447.  We conclude and
hold that the trial court did not err by granting a no-evidence summary
judgment on Kelly’s intentional infliction of emotional distress claim.

We overrule Kelly’s first issue.[18]

Conclusion

          Having overruled the dispositive parts of
Kelly’s two issues, we affirm the trial court’s judgment.

 

 

 

                                                                             TERRIE
LIVINGSTON

                                                                             CHIEF
JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

 

DELIVERED:  May 12, 2011









[1]See
Tex. R. App. 47.4.





[2]Kelly
also sued Allen and Shiloh, but she dismissed both parties after settling with
them.  Shiloh is now known as Shiloh Church.





[3]Although
we typically review a no-evidence summary judgment first when both a
traditional and no-evidence summary judgment are granted, we will review one of
the grounds of the traditional motion first because some of the same evidence
presented by Kelly is pertinent to the no-evidence issues.  See Reynolds v.
Murphy, 188 S.W.3d 252, 258 (Tex. App.––Fort Worth 2006, pet. denied) (op.
on reh’g), cert. denied, 549 U.S. 1281 (2007).





[4]Because
many of the pastors and COGIC officials referred to in the evidence are often
referred to by different titles, we will refer to those pastors and officials
solely by their last names to prevent confusion.





[5]At
some point, Allen held a national position with COGIC as assistant to the
evangelist department president.





[6]In
contrast, COGIC’s Doctrines and Discipline states, “A local church, which has
been accepted by [COGIC] and issued a Certificate of Membership, shall not have
the legal right or privilege to withdraw or sever its relations with the
General Church, except by and with the permission of the General Assembly.”





[7]Kelly
did not plead or attempt to raise a fact issue on ostensible agency.  See,
e.g., Baptist Mem’l Hosp. Sys. v. Sampson, 969 S.W.2d 945, 949–50 (Tex.
1998); Farlow, 284 S.W.3d at 919–20.





[8]COGIC
also moved for a no-evidence summary judgment on whether Allen was an employee
of COGIC.  Kelly’s evidence fails to raise a fact issue under that standard as
well.





[9]COGIC
appointed Harris and Williams to investigate Kelly’s 2005 complaint to COGIC.





[10]The
parties agree that the question of whether a duty exists is controlled by Golden
Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins, 926 S.W.2d 287
(Tex. 1996).  For purposes of our analysis, we will presume, without deciding,
that COGIC owed Kelly a duty under the principles set forth in Golden Spread.





[11]Nelson
could not remember meeting with Haynes.





[12]McDonald
thought Johnson was a COGIC superintendent; Thomas was another pastor.





[13]Haynes
later said another of the women’s husbands may have been present.





[14]The
record does not show how long this self-imposed cessation lasted; however, the
record is clear that Allen resumed his duties at some point after breaking ties
with COGIC.





[15]Our
analysis should not be construed to approve of COGIC’s response to the 1990
allegations or to diminish the seriousness of Allen’s alleged behavior. 
However, on the specific facts of this case, the link between COGIC’s alleged
lack of, or ineffectual, response in 1990 and the heinous acts alleged in 2001
through 2005 are too attenuated to amount to cause in fact under our negligence
law.





[16]Because
we conclude that there is no evidence of cause in fact, we do not address the
parties’ foreseeability arguments.  We note that COGIC’s argument––that the
1990 allegations of paddling “did not make it foreseeable that a grown,
competent, 28 year old woman would allow herself to be paddled regularly
for 4 years and to be repeatedly raped over a period of 4 months”––appears to
attack Kelly’s credibility and, as such, does not comport with the applicable
standard of review.  [Emphasis added.]  Nothing in the facts alleged by Kelly,
including any delay in a failure to report, compels the conclusion that her
testimony lacked credibility; furthermore, the credibility of a witness is not
a matter to be resolved by a no-evidence summary judgment.  See, e.g., Wilcox
v. Marriott, 103 S.W.3d 469, 475 (Tex. App.––San Antonio 2003, pet.
denied).  Despite the offensiveness of this argument, which we presume was
unintended but which nevertheless implies that a woman can be culpable for
“allow[ing]” herself to be “repeatedly raped,” we did not consider it in our
analysis of this issue as it was not necessary for us to reach foreseeability. 
See Cunningham v. Blue Cross Blue Shield of Tex., No. 02-06-00363-CV,
2008 WL 467399, at *2 (Tex. App.––Fort Worth Feb. 24, 2008, pet. denied) (mem.
op.) (on reh’g).





[17]The
evidence shows that the Kellys began attending Shiloh in either 1997 or 2000.





[18]Because
we have concluded that the trial court properly granted either a traditional or
no-evidence summary judgment on all of Kelly’s claims, we need not address the
contention in her second issue that the negligence claims are not barred on
First Amendment grounds.  See Tex. R. App. P. 47.1.